*ConAgra Foods RDM, Inc. v. Comptroller of the Treasury*, No. 1940, September Term, 2015.  Opinion by Woodward, J.

**TAXATION – INCOME TAX – CORPORATION INCOME TAX – TAXATION OF NON-DOMICILIARY CORPORATION – CONSTITUTIONAL REQUIREMENTS**

For a state to tax a non-domiciliary corporation, such taxation must withstand constitutional scrutiny under both the Due Process and Commerce Clauses of the United States Constitution.  Although these clauses have different purposes and requirements, they have significant parallels.  The Due Process Clause requires that (1) there be a minimal connection between the interstate activities of the non-domiciliary corporation and the taxing state, and (2) there be a rational relationship between the income attributed to the taxing state and the intrastate values of the enterprise being taxed.  The Commerce Clause requires that the tax in question (1) apply to an activity with a substantial nexus with the taxing state, (2) be fairly apportioned, (3) not discriminate against interstate commerce, and (4) be fairly related to the services the taxing state provides.

**TAXATION – INCOME TAX – CORPORATION INCOME TAX – TAXATION OF NON-DOMICILIARY CORPORATION – CONSTITUTIONAL REQUIREMENTS – LACK OF ECONOMIC SUBSTANCE AS A SEPARATE ENTITY**

In *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492 (2014), the Court of Appeals held that the constitutional requirements for taxation of out-of-state wholly owned subsidiary corporations are satisfied where the subsidiaries "ha[ve] no real economic substance as separate business entities" from their parent corporations that do business in Maryland.  (quoting *Comptroller v. SYL, Inc.*, 375 Md. 78, 106, *cert. denied*, 540 U.S. 984 and *cert. denied*, 540 U.S. 1090 (2003)).  After reviewing the Court of Appeals' opinions in *Gore* and *SYL*, the Court articulated the four factors that courts should look to in determining whether a foreign wholly owned subsidiary lacks economic substance as a business entity separate and apart from its parent corporation that does business in Maryland.  First, a court should consider how dependent the subsidiary is on its parent company for income.  Second, a court should consider whether there is a circular flow of money from the parent company to the subsidiary and then back to the parent.  Third, a court should consider how much the subsidiary relies on the parent for its core functions and services.  Fourth, a court should consider whether the subsidiary engages in substantive activity that is in any meaningful way separate from the parent.

Applying these factors to the instant case, which involved a foreign wholly owned subsidiary, Brands, and Brands's parent corporation, ConAgra, the Court held that there was substantial evidence to support the Tax Court's findings of (1) Brands's dependence on ConAgra and its other subsidiaries for the "vast majority" of its income, (2) the circular flow of money from ConAgra and its subsidiaries to Brands and back to ConAgra, (3)

Brands's reliance on ConAgra for its core functions, and (4) Brands's lack of any meaningful substantive activity separate from ConAgra.

The Court rejected Brands's argument that third-party income received by Brands gave it economic substance as a separate entity, noting that Brands received the vast majority of its income from ConAgra and the latter's subsidiaries. The Court also rejected Brands's argument that, because Brands did not pay dividends or make loans to ConAgra, there was no circular flow of money between them, emphasizing that the cash management system utilized by ConAgra and its subsidiaries achieved the same functional result. The Court additionally rejected Brands's argument that the Tax Court, in affirming the Comptroller's assessment against it, should have given more weight to the non-tax business reasons for the establishment of Brands. The Court noted that the motivation behind creating Brands was not dispositive.

**TAXATION – INCOME TAX – CORPORATION INCOME TAX – APPORTIONMENT OF MARYLAND MODIFIED INCOME – 3-FACTOR FORMULA – MODIFICATION BY COMPTROLLER – USE OF BLENDED APPORTIONMENT FORMULA**

The Tax General Article provides that, where a corporation does business both within and outside of the state, the corporation shall allocate to Maryland the part of the corporation's Maryland modified income that is derived from or reasonably attributable to the part of its trade or business carried on in Maryland. TG § 10-402(a)(2) (now §10-402(b)(2)). Although the Tax General Article lays out a 3-factor apportionment formula, the Article also empowers the Comptroller to modify elements of the formula "[t]o reflect clearly the income allocable to Maryland[.]" TG § 10-402(e). The Court held that, because utilizing the traditional 3-factor formula would have resulted in an apportionment factor of zero for Brands's payroll, property, and sales in Maryland, the Comptroller had adequately demonstrated the need to alter the 3-factor formula. The Court further held that the Comptroller did not err or abuse its discretion in utilizing a "blended apportionment factor" that was derived from the apportionment factors used by ConAgra and its subsidiaries.

**TAXATION – INCOME TAX – INTEREST – WAIVER OF INTEREST AND PENALTIES BY THE TAX COURT**

The authority to abate interest owed on unpaid taxes vests both in the tax collector and the Tax Court. When reviewing the Comptroller's decision not to abate interest, the Tax Court must consider whether the taxpayer has demonstrated with affirmative evidence that reasonable cause exists for abatement or that the tax Comptroller's decision was an obvious error. Noting that "reasonable cause" is not defined in the Tax General Article, and that courts give great weight to the legal conclusions of administrative agencies regarding the statutes that they administer, the Court held that the Tax Court may properly find that

reasonable cause exists for abatement of interest where there is uncertainty in the state of the caselaw when applied to the circumstances of a particular taxpayer.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1940

September Term, 2015

_____

CONAGRA FOODS RDM, INC.

v.

COMPTROLLER OF THE TREASURY

_____

Arthur,
Leahy,
*Woodward,

JJ.

_____

Opinion by Woodward, J.

_____

Filed: June 27, 2019

*Woodward, Patrick L., J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the preparation of this opinion.

**Fader, C.J. and Kehoe, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Appellant, ConAgra Foods RDM, Inc., formerly known as ConAgra Brands, Inc. ("Brands"),[1] is an intellectual property holding company and a direct and indirect wholly owned subsidiary of ConAgra Foods, Inc., formerly known as ConAgra, Inc. ("ConAgra"). Brands was incorporated in 1996 in Nebraska and has a principal office in Omaha, Nebraska. During the time period of 1996 through 2003, ConAgra conducted business operations in Maryland and filed corporation income tax returns in Maryland. For the same time period, Brands did not file any Maryland corporation income tax returns. Because Brands received royalties from ConAgra,[2] appellee, the Comptroller of the Treasury ("Comptroller"), on August 30, 2007, assessed Brands $2,768,588 in back taxes, interest, and penalties for the tax years of 1996 through 2003. Brands appealed this assessment, and the Comptroller affirmed by issuing a Notice of Final Determination on January 23, 2009.

On February 23, 2009, Brands appealed to the Tax Court. After a hearing, the Tax Court ruled, in a Memorandum of Grounds for Decision dated February 24, 2015, that Brands lacked economic substance as a business entity separate from ConAgra and thus allowed the Comptroller to impose the tax assessment. The Tax Court, however, abated the interest accrued from the date of the appeal to that court to the date of its decision, and all penalties. Brands and the Comptroller filed petitions for judicial review in the Circuit

---

[1] Throughout this opinion, we will refer to ConAgra Foods RDM, Inc. as Brands. It is undisputed that ConAgra Brands, Inc., a Nebraska corporation, and ConAgra Foods RDM, Inc., a Delaware corporation, merged in 2007.

[2] Brands also received royalties from other wholly owned subsidiaries of ConAgra who filed corporation income tax returns in Maryland.

Court for Anne Arundel County, which resulted in the court affirming the Tax Court's decision, except for the latter's abatement of interest accruing from March 24, 2014 to February 24, 2015. Brands then filed this timely appeal.

Brands presents eight questions for our review, which we have rephrased and condensed into three:[3]

---

[3] Brands's questions, as set forth in its brief, are as follows:

1.  Did the Tax Court commit error when it confirmed the Comptroller's assessment against Brands even though Brands had economic substance as a separate business entity?
2.  Did the Tax Court commit error when it failed to find that the Comptroller's assessment against Brands violated the Due Process Clause of the United States Constitution because Brands did not purposefully avail itself of the Maryland marketplace and had no other contacts with the state?
3.  Did the Tax Court commit error when it failed to confirm that the Comptroller's assessment against Brands violated the Commerce Clause of the United States Constitution because Brands lacked a substantial nexus with the state?
4.  Did the Tax Court commit error when it confirmed the Comptroller's assessment against Brands even though the Comptroller failed to follow the Sec. 10-402(c) standard statutory apportionment formula?
5.  Did the Tax Court commit error when it confirmed the Comptroller's assessment against Brands even though the Comptroller, in adopting an apportionment methodology[,] failed to establish that the statutory apportionment formula did not fairly represent the extent of Brands'[s] business activities in the state?
6.  Did the Tax Court commit error when, in violation of the Due Process and Commerce Clauses of the United States Constitution, it confirmed the Comptroller's adoption of an alternative apportionment formula that failed to reasonably reflect Brands'[s] business activities in the state?
7.  Did the Tax Court commit error by confirming the Comptroller's assessment against Brands in finding that Brands lacked economic substance and, as a result, essentially did not, for tax purposes, exist as a separate legal entity?
8.  Did the Tax Court abuse its discretion when it partially waived interest on the tax assessment against Brands?

2

1. Was there substantial evidence to support the Tax Court's ruling that Brands lacked economic substance as a business entity separate from ConAgra and thus had the constitutionally required nexus and minimum contacts with Maryland to subject Brands to income taxation by Maryland for the royalties received by Brands from ConAgra and its subsidiaries arising out of the latters' business activities in Maryland?

2. Was there substantial evidence to support the Tax Court's ruling that the Comptroller had the statutory authority to use a blended apportionment formula to determine Brands's Maryland income and that the blended apportionment formula clearly reflected Brands's income allocable to Maryland?

3. Did the Tax Court properly interpret the tax statute when it waived interest on the income tax due from Brands that accrued from the date of the filing of its appeal to the Tax Court (February 23, 2009) to the date of the issuance of that court's decision (February 24, 2015)?

For the reasons set forth below, we uphold the decision of the Tax Court in all respects and thus affirm in part and reverse in part the judgment of the circuit court.

## BACKGROUND

ConAgra is a conglomerate known for its agricultural products and products in the processed food industry including, but not limited to, Hunts, Orville Redenbacher, Butterball Turkey, and ACT II. In the late 1990s, ConAgra had multiple wholly owned subsidiaries (also known as independent operating companies), including Swift-Eckrich, Inc., Hunt-Wesson, Inc., and Beatrice Cheese, Inc. The multitude of ConAgra's wholly owned subsidiaries began to present management problems for ConAgra, and in 1996, ConAgra began a program focused on corporate centralization.

One such centralization initiative occurred in April 1996 when ConAgra decided to

3

centralize management of the intellectual property owned by it and its subsidiaries. To effectuate this goal, ConAgra incorporated Brands in Nebraska. Brands issued 2,207 shares of common stock, distributing 1,000 shares to ConAgra, 594 shares to Swift-Eckrich, Inc, 560 shares to Hunt-Wesson, Inc., and 53 shares to Beatrice Cheese, Inc. In exchange, Brands acquired forty-six initial trademark groups and subsequently acquired numerous other trademark groups from these entities. Brands then entered into license agreements for the trademark groups with ConAgra and the three subsidiaries, under which ConAgra and these subsidiaries paid Brands royalties.[4]

From 1996 to 2003, Brands did not file Maryland tax returns, but ConAgra and some of its subsidiaries did file Maryland tax returns. After an audit, the Comptroller sent Brands a "Notice and Demand to File Maryland Corporation Income Tax Returns" in 2007. When Brands did not respond to the Comptroller's notice and demand, the Comptroller issued a "Notice of Assessment" for the tax years of 1996 to 2003 for a total of $2,768,588 in back taxes, interest, and penalties as of August 30, 2007. Upon Brands's request, an administrative appeal was held on December 4, 2007, concerning the Comptroller's assessment. On January 23, 2009, the Comptroller issued a "Notice of Final Determination[,]" concluding that Brands then owed $3,053,222 in back taxes, interest, and penalties. Brands filed a timely Petition of Appeal to the Tax Court on February 23, 2009.

---

[4] Although not clear from the record, it appears that during the tax years in question, royalties were paid to Brands by ConAgra and either the three subsidiaries or their respective successors.

4

After a two-day hearing concluding on October 7, 2010, the Tax Court issued its opinion upholding the Comptroller's assessment on February 24, 2015. The Tax Court stated that the "initial inquiry [was] to determine whether [Brands] had real economic substance as a business separate from ConAgra." Citing to *Comptroller v. SYL, Inc.*, 375 Md. 78, *cert. denied*, 540 U.S. 984 and *cert. denied*, 540 U.S. 1090 (2003) and *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492 (2014), the Tax Court observed that, under the economic substance doctrine set forth in those cases, an out-of-state subsidiary "must have economic substance as a separate entity from its parent to avoid nexus and taxation." After a review of the evidence before it, the court concluded that Brands lacked any economic substance separate from ConAgra. Because a portion of Brands's income was produced from the business of ConAgra and its subsidiaries in Maryland, the court held that there was sufficient nexus to support the income taxation of Brands.

The Tax Court then considered whether the Comptroller applied an appropriate apportionment formula in calculating the income tax that Brands owed to Maryland. The Tax Court determined that the Comptroller's blended apportionment formula was permissible, because "the Comptroller effectively utilized ConAgra's own apportionment figures in constructing the blended apportionment factor used in this case."[5] Finally, the Tax Court abated the interest accruing after the date of filing the appeal to the Tax Court (February 23, 2009) to the date of the Tax Court's decision (February 24, 2015), and all

---

[5] The record revealed that the apportionment factor was calculated using the apportionment factors of ConAgra and its subsidiaries that filed corporation income tax returns in Maryland.

5

penalties.[6]

On March 17, 2015, Brands filed a petition for judicial review in the circuit court challenging the Tax Court's ruling that it was subject to Maryland tax, as well as the Comptroller's apportionment formula. The Comptroller filed a cross-petition for judicial review challenging the Tax Court's decision to abate all interest accruing from the date of filing the appeal with the Tax Court to the issuance of that court's decision. After a hearing on September 21, 2015, the circuit court issued an opinion and order on October 30, 2015, affirming the Tax Court in all respects, except for the latter's abatement of interest accruing from March 24, 2014 to February 24, 2015.[7]

Brands filed this timely appeal. Additional facts will be set forth below as they become necessary to the resolution of the questions presented in this appeal.

### STANDARD OF REVIEW

The Tax Court is an adjudicatory administrative agency; "our review looks through the circuit court's . . . decision[ ] . . . and evaluates the decision of the agency." *Gore*, 437

---

[6] The Tax Court also concluded that the assessment, which was issued in 2007, was not barred by the statute of limitations, because the "three-year statute of limitations for assessments does not apply when a taxpayer does not file a required return," and Brands did not file a return for any of the tax years at issue. That ruling is not at issue before this Court.

[7] The circuit court viewed the instant case "to be substantially similar to the factual situation in *Gore*, and as such, the [c]ourt finds that the interest in the instant case should be treated in the same way as it was treated in *Gore*." In *Gore*, the Court of Appeals did not disturb the Comptroller's assessment of interest. *Gore*, 437 Md. at 503. The circuit court held that the Tax Court abused its discretion by abating the interest "collected after the date of issuance of the *Gore* decision on March 24, 2014."

Md. at 503 (some alterations in original) (internal quotation marks omitted). The Court of

Appeals has further explained our review of a decision of the Tax Court as follows:

> An administrative agency's findings of fact must meet the substantial evidence standard. *Frey* [*v. Comptroller*,] 422 Md. [111,] [ ] 137, 29 A.3d [475,] [ ] 490 (citations omitted). Thus, we determine "'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Frey,* 422 Md. at 137, 29 A.3d at 490 (quoting *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters,* 248 Md. 292, 309, 236 A.2d 282, 292 (1967)). It is not our place to "make an independent original estimate of our decision on the evidence.... [or determine for ourselves], as a matter of first instance, the weight to be accorded to the evidence before the agency." In *Ramsay Scarlett & Co., Inc. v. Comptroller of the Treasury*, 302 Md. 825, 838, 490 A.2d 1296, 1303 (1985) (citations omitted)*,* we cautioned:

> > [T]hat a reviewing court may not substitute its judgment for the expertise of the agency; that we must review the agency's decision in the light most favorable to it; that the agency's decision is prima facie correct and presumed valid; and that it is the agency's province to resolve conflicting evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences.

> *Ramsay,* 302 Md. at 834–35, 490 A.2d at 1301 (citations omitted).

> "[T]he interpretation of the tax law can be a mixed question of fact and law, the resolution of which requires agency expertise." *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.,* 389 Md. 156, 164, 884 A.2d 112, 116–17 (2005) (citing *NCR Corp. v. Comptroller,* 313 Md. 118, 133–34, 544 A.2d 764, 771 (1988)). In reviewing mixed questions of law and fact, "we apply 'the substantial evidence test, that is, the same standard of review [we] would apply to an agency factual finding.'" *Comptroller of the Treasury v. Science Applications Intern. Corp.,* 405 Md. 185, 193, 950 A.2d 766, 770 (2008) (quoting *Longshore v. State,* 399 Md. 486, 522 n. 8, 924 A.2d 1129, 1149 n. 8 (2007)).

The legal conclusions of an administrative agency that are "premised upon an interpretation of the statutes that the agency administers" are afforded "great weight." *Frey,* 422 Md. at 138, 29 A.3d at 490 (citations omitted). Agency decisions premised upon case law, however, are not entitled to deference. *Frey,* 422 Md. at 138, 29 A.3d at 490 ("When an agency's decision is necessarily premised upon the 'application and analysis of caselaw,' that decision rests upon 'a purely legal issue uniquely within the ken of a reviewing court.'" (quoting [*People's Counsel for Baltimore Cty. v.*] *Loyola College* [*in Md.*]*,* 406 Md. [54,] [ ] 67–68, 956 A.2d [166,] [ ] 174 [2008])).

*Id.* at 504-05 (some alterations in original).

## DISCUSSION

### I. Taxation and the United States Constitution

For a state to tax a non-domiciliary company, like Brands, such taxation must withstand constitutional scrutiny under the Due Process and Commerce Clauses of the United States Constitution. *Gore*, 437 Md. at 506-07. The satisfaction of these constitutional restrictions on government action have different purposes and requirements, but these clauses also have "significant parallels." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2093 (2018).

The Due Process Clause imposes restrictions on the government to act in a fair manner and provide "fair warning." *Gore*, 437 Md. at 507. Under the Due Process Clause, there are "two requirements: [1] a 'minimal connection' between the interstate activities and the taxing State, and [2] a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 436-37 (1980).

8

The Commerce Clause, on the other hand,

> was designed to prevent States from engaging in economic discrimination so they would not divide into isolated, separable units. See *Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S. Ct. 2531, 57 L.Ed.2d 475 (1978). But it is "not the purpose of the [C]ommerce [C]lause to relieve those engaged in interstate commerce from their just share of state tax burden." *Complete Auto* [*Transit, Inc. v. Brady*, 430 U.S. 274, 288 (1977)] (internal quotation marks omitted).

*Wayfair*, 138 S. Ct. at 2093-94 (alterations in original). The Commerce Clause requires that a tax "(1) appl[y] to an activity with a substantial nexus with the taxing State, (2) [be] fairly apportioned, (3) [ ] not discriminate against interstate commerce, and (4) [be] fairly related to the services the State provides." *Id.* at 2091. The first prong of the Commerce Clause "test simply asks whether the tax applies to an activity with a substantial nexus with the taxing State. [S]uch a nexus is established when the taxpayer [or collector] avails itself of the substantial privilege of carrying on business in that jurisdiction." *Id.* at 2099 (alterations in original) (internal citation and quotation marks omitted). In holding that such nexus can be satisfied through "economic and virtual contacts," the Court overturned its previous precedent of requiring that a company have physical presence within the State imposing taxation, and in so doing, moved the nexus requirement in the Commerce Clause and the Due Process Clause requirement of minimal contacts into closer alignment. *See id.* at 2092-93 ("This nexus requirement is closely related to the due process requirement that there be some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." (internal citation and quotation marks omitted)).

## II. Lack of Economic Substance as a Separate Entity

In the instant case, Brands is an out-of-state direct and indirect wholly owned subsidiary of ConAgra. During the tax years in question, Brands received royalties under the trademark license agreements from ConAgra and its subsidiaries, a portion of which was derived from the business activities of ConAgra and its subsidiaries in Maryland. In *SYL* and *Gore*, the Court of Appeals held that the constitutional requirements for state taxation of out-of-state wholly owned subsidiary corporations are satisfied where the subsidiaries "'had no real economic substance **as separate business entities**.'" *Gore*, 437 Md. at 513-14 (quoting *SYL*, 375 Md. at 106) (bold emphasis in *Gore*). In other words, the Due Process Clause requirement of "minimum contacts" and the Commerce Clause requirement of "nexus" are satisfied for such subsidiaries "'based upon their parent corporations' Maryland business[.]'" *Gore*, 437 Md. at 514 (alteration in original) (quoting *SYL*, 375 Md. at 109). Therefore, the central issue raised in the instant case is whether Brands had real economic substance as a business entity separate from ConAgra. To resolve this issue, we must begin with a close examination of *SYL* and *Gore*.

### A. *SYL*

In *SYL*, the Court of Appeals consolidated two cases in which the Comptroller assessed Maryland taxes against foreign intellectual property holding companies that were wholly owned subsidiaries of parent companies doing business in Maryland. 375 Md. at 80-81, 92.

The first case involved the clothing company Syms, Inc. ("Syms"). *Id.* at 81. Syms created a wholly owned subsidiary, SYL, Inc. ("SYL"), and incorporated this subsidiary in

10

Delaware. *Id.* Syms then transferred all of its intellectual property to SYL, and "SYL granted to Syms a license to manufacture, use and sell the products covered by the trade names and trademarks in [Syms]'s business[.]" *Id.* SYL received royalties pursuant to its license agreement with Syms, and SYL, in turn, would issue dividends to Syms — the owner of all of SYL's stock. *Id.* at 81, 86. Although Syms filed Maryland corporation income tax returns, SYL did not, and in 1996, the Comptroller issued an assessment against SYL "for the years 1986 through 1993 [in the] amount of $637,362 in corporate income taxes, including interest and penalties." *Id.* at 81.

The companion case involved Crown Cork & Seal Company (Delaware) ("Crown Delaware"). *Id.* at 92. Crown Delaware was a wholly owned subsidiary of Crown Cork & Seal Company, Inc. ("Crown Parent"), which was "a corporation engaged in the manufacturing and sale of metal cans, crowns, and closures for bottles, can-filling machines, and plastic bottles and containers, world-wide, including in the State of Maryland." *Id.* (internal quotation marks omitted). Crown Delaware was a Delaware corporation created by Crown Parent to manage its intellectual property, and Crown Delaware acquired "thirteen domestic patents and sixteen trademarks" from Crown Parent. *Id.* "Crown Delaware then granted to Crown Parent an exclusive license . . . [and] Crown Parent agreed to pay Crown Delaware a royalty based on Crown Parent's sales." *Id.* at 94. Then, Crown Delaware would provide Crown Parent with loans, sometimes the same day as it received royalties from Crown Parent. *Id.* at 96. Like SYL and Syms, Crown Delaware did not file corporation income tax returns in Maryland, but Crown Parent did.

11

*Id.* at 92. The Comptroller issued an assessment against Crown Delaware for $1,421,034 in back taxes including interest and penalties, for the years 1989 through 1993. *Id.*

SYL and Crown Delaware took separate appeals to the Tax Court. *Id.* at 84, 93. In separate decisions, the Tax Court concluded that Maryland did not have the authority to tax SYL and Crown Delaware, because both companies were not completely shell corporations and neither had a sufficient nexus with Maryland. *Id.* at 88-90, 98-99. The Comptroller appealed both cases, and the circuit court upheld the Tax Court in separate rulings. *Id.* at 91, 99. Again, the Comptroller appealed, but before the appeals were heard by this Court, the Court of Appeals granted the petitions for a writ of certiorari. *Id.*

On appeal, the Court of Appeals examined this Court's opinion in *Comptroller v. Armco Exp. Sales Corp.*, 82 Md. App. 429, *cert. denied*, 320 Md. 634 (1990), and *cert. denied*, 498 U.S. 1088 (1991). *SYL*, 375 Md. at 103-05. In that case, this Court considered whether Maryland had the authority to tax three subsidiaries created by Armco, Inc., General Motors, and Thiokol. *Id.* at 103. These subsidiaries were known as "Domestic International Sales Corporation[s] or DISC[s,]" and their sole purpose was to buy goods from their respective parents and then resell the goods to overseas customers, incurring for the parent a federal tax benefit. *Id.* at 103-04. This Court held that Maryland could tax the income of the DISCs. *Id.* at 105. We noted that the parent companies conducted business in Maryland. *Id.* at 104. We also noted that the DISCs relied completely on their respective parent corporations, because each DISC had "no tangible property or employees and c[ould] only conduct its activity and do business through branches of its unitary affiliated parent." *Id.* (internal quotation marks omitted).

12

The Court of Appeals adopted our *Armco* reasoning and applied it to SYL and Crown Delaware. *Id.* at 106. The Court noted that SYL and Crown Delaware resembled the DISC corporations in *Armco*, "except that SYL and Crown Delaware had a touch of 'window dressing' designed to create an illusion of substance." *Id.* The Court continued:

> Neither subsidiary had a full time employee, and the ostensible part time "employees" of each subsidiary were in reality officers or employees of independent "nexus-service" companies. The annual wages paid to these "employees" by the subsidiaries were minuscule. The so-called offices in Delaware were little more than mail drops. **The subsidiary corporations did virtually nothing; whatever was done was performed by officers, employees, or counsel of the parent corporations. The testimony indicated that, with respect to the operations of the parents and the protections of the trademarks, nothing changed after the creation of the subsidiaries**. Although officers of the parent corporations may have stated that tax avoidance was not the sole reason for the creation of the subsidiaries, the record demonstrates that sheltering income from state taxation was the predominant reason for the creation of SYL and Crown Delaware.

*Id.* (Emphasis added).

Indeed, the undisputed record revealed that SYL was completely dependent on Syms for income, and all income was returned to Syms in the form of dividends. *Id.* at 84, 86. SYL's Board of Directors were all officers of Syms, except that one Board member, Edward Jones, was an accountant employed by the firm Gunnip and Company — a firm SYL hired to provide services, such as a mailing address, and to establish a presence in Delaware. *Id.* at 86-87. Daily expenses at SYL were minimal, the record indicating that SYL only spent $2,400 a year for services provided by Gunnip and Company, which included $1,200 a year for the "salary" of Jones, SYL's sole employee. *Id.* at 87. No expenses were for the protection of any trademarks, and SYL's license agreement with

13

Syms provided Syms with full control over the trademarks and the protection of the marks. *Id.* at 87-88.

As to Crown Delaware, the undisputed record revealed that Crown Parent held the exclusive license to Crown Delaware's intellectual property. *Id.* at 94. Crown Delaware and Crown Parent's circular flow of money was evidenced by Crown Parent paying Crown Delaware royalties and Crown Delaware loaning money back to Crown Parent, sometimes on the same day. *Id.* at 96. The day to day operations of Crown Delaware were handled by Organization Services, Inc. ("OSI"). *Id.* at 94-95. For $100 a month, OSI provided office space, a mailing address, and nine part-time employees who were paid a total of $843.66 in wages for 1993. *Id.* at 95-96. In short, Crown Delaware's revenues "averaged around thirty-seven million dollars annually" but only spent on average just over two thousand dollars annually in expenses — none of which were for legal fees. *Id.* at 97. The record was devoid of any indication that Crown Delaware performed any function to promote or preserve the intellectual property it had acquired from Crown Parent. *Id.* at 97-98.

The Court of Appeals concluded that "SYL and Crown Delaware had no real economic substance as separate business entities." *Id.* at 106. Accordingly, the Court held "that a portion of SYL's and Crown Delaware's income, based upon their parent corporations' Maryland business, is subject to Maryland income tax." *Id.* at 109.

### B. *Gore*

*Gore* is the most recent case involving the taxation of a foreign intellectual property holding company that is a wholly owned subsidiary of a corporation doing business in

14

Maryland. 437 Md. 492. In *Gore*, W.L. Gore & Associates, Inc. ("Gore") was a manufacturing company of "fabrics, medical devices, electronics, and industrial products" that operated factories in several states, including Maryland. *Id.* at 499-500. In 1983, Gore incorporated Gore Enterprise Holdings, Inc. ("GEH") in Delaware to manage its patents. *Id.* at 500. Gore assigned to GEH all of its patents and certain other assets in exchange for GEH's entire stock. *Id.* GEH then licensed the patents back to Gore for a royalty fee on all products sold by Gore. *Id.* GEH also entered into a licensing agreement with Gore that allowed Gore's attorneys to control the legal defense to patent infringement, licensing activities, and patent applications. *Id.* In addition, GEH did not have any employees until 1995, when it hired one employee to manage the patent portfolio. *Id.* at 500-01.

In 1996, Gore incorporated Future Value, Inc. ("FVI")

> in Delaware to manage Gore's excess capital. A Gore-employed attorney incorporated it, and two members of the Gore Board, along with GEH's Vice President, comprised the FVI Board. Upon FVI's formation, GEH transferred all of its investment securities to FVI, in exchange for all of the shares of FVI. GEH then declared a dividend to its sole shareholder, Gore, in the form of the FVI stock. This made Gore the sole owner of FVI. FVI was founded primarily to perform investment management functions, but has also extended Gore a line of credit when Gore experienced negative cash flow. As of 2008, FVI had three employees that handled, monitored, and recorded the various activities performed by FVI.

*Id.* at 501 (footnote omitted).

In 2006, the Comptroller assessed back income taxes, interest, and penalties in the amount of $26,436,315 against GEH for the years 1983 through 2003. *Id.* Concurrently, the Comptroller assessed FVI $2,608,895 in back income taxes, interest, and penalties for the years 1996 through 2003. *Id.* The Tax Court upheld the Comptroller's tax assessment,

15

ruling that GEH and FVI lacked economic substance separate from Gore, but the circuit court reversed. *Id.* at 501-02. The Comptroller appealed to this Court, and we upheld the Tax Court's ruling that GEH and FVI were subject to Maryland tax. *Id.* at 502. GEH and FVI petitioned the Court of Appeals for a writ of certiorari, which was granted. *Id.*

The Court of Appeals began its analysis by agreeing with the Tax Court that the threshold issue on appeal was whether GEH and FVI lacked economic substance as business entities separate from Gore. The Court observed that the Tax Court

> marshaled numerous factual findings, supported by substantial record evidence. These included the following:
>
> • There were no outside Directors of GEH or FVI and prior to 1996 the W.L. Gore family dominated the Officer list.
>
> • FVI was simply an intentional depository for assets built up through royalties paid to the patent company, GEH.
>
> • In effect, GEH does not create, invent or make anything and must rely on W.L. Gore employees to invent the new process or product. Thus, an idea generated by a technologist with W.L. Gore is prepared by GEH through an application for filing with the patent office. In most cases, the employees of W.L. Gore review the patent application and determine whether it should be pursued.
>
> • The testimony in the case suggests that GEH relied on W.L. Gore for a continuing stream of inventions and discoveries as set forth in the materials that make up the patent application.
>
> • The manufacture or sale of the product by W.L. Gore obligates the payment of royalties to GEH under the License Agreement.
>
> • GEH as licensor to W.L. Gore, Inc., licensee, is dependent on the licensee's activities to obtain consideration for grants of the license. Although GEH has separate corporate status, the inter-dependence reflected in the third party License Agreements

suggests that the patent committee of GEH strongly considers the interest of W.L. Gore in making its decisions.

• One witness for GEH who described herself as a Patent Administrator confirmed that W.L. Gore employees would prepare patent applications at no cost to GEH and that payments were made for GEH in accordance with the Service Agreement with W.L. Gore.

• [An economist for Petitioners] agreed that W.L. Gore and GEH had globally integrated goals and that a synergy existed between W.L. Gore and GEH due to the relationship between patents and products.

• Testimony from [ ] Petitioners' witnesses consistently suggested that nearly all of the third-party licenses came about in order to produce benefits for W.L. Gore or for the "W.L. Gore family of companies."

• In 1996, W.L. Gore was experiencing some negative cash flow when W.L. Gore asked FVI for a line of credit to meet current operating needs which continued through 1999. The inter-company loans reflected the intercompany dependence of FVI.

• The audits reflected through the inter-corporate transactions and Service Agreement that the Delaware Holding Companies relied on W.L. Gore for revenues and services.

*Id.* at 516-17 (alterations in original) (footnote omitted).

The Court then summarized the four primary factual conclusions that led the Tax Court to properly rule that GEH and FVI lacked economic substance as business entities separate from Gore:

[1] the subsidiaries' dependence on Gore for their income, [2] the circular flow of money between the subsidiaries and Gore, [3] the subsidiaries' reliance on Gore for core functions and services, and [4] the general absence of substantive activity from either subsidiary that was in any meaningful way separate from Gore.

*Id.* at 517.

17

According to GEH and FVI, however, *SYL* was distinguishable, because GEH and FVI "engaged in more substantive activities than those in *SYL*." *Id.* at 519. Specifically, "GEH acquired patents from third parties, licensed patents to third parties, and paid substantial fees for outside legal counsel and other services." *Id.* The Court characterized these activities as "more 'window dressing' than the *SYL* subsidiaries," but concluded that "these additional trappings do not imbue GEH and FVI with substance **as separate entities**." *Id.* (Emphasis in original). The Court elaborated: "Indeed, Gore permeates the substantive activities of both GEH and FVI. Petitioners' employees and operations are so intertwined with Gore as to be almost inseparable, as the 'Legal Services Consulting Agreement,' and reliance on Gore—for everything from professional services, to things like office space—so indicate." *Id.* at 519-20.

## C. *Synopsis of SYL and Gore*

As previously stated, under *SYL* and *Gore* a nexus or minimal contacts with the State of Maryland that satisfies the constitutional requirements for income taxation by Maryland can be established when a foreign wholly owned subsidiary lacks economic substance as a business entity separate and apart from its parent company that does business in Maryland. *See Gore*, 437 Md. at 517-18; *SYL*, 375 Md. at 106. Whether a subsidiary lacks economic substance as a separate business entity is to be determined on a case by case basis, by considering four general factors.[8] *Gore*, 437 Md. at 517.

---

[8] The Court of Appeals did not indicate in *Gore* that these factors were exhaustive. *See Gore*, 437 Md. at 517.

18

First, a court should consider how dependent a subsidiary is on its parent company for income. *Id.* at 519. *Gore* and *SYL* instruct that a court should consider the amount of income a subsidiary receives from its parent company or other companies owned by the parent company. *Id.* at 515, 517; *SYL*, 375 Md. at 84, 86, 94. A court also should consider how much income is generated from third parties and how that income may compare with other sources of the subsidiary's income. *See Gore*, 437 Md. at 517.

Second, a court should consider whether there is a circular flow of money from the parent company to the subsidiary and then back to the parent. *Id.* at 515; *SYL*, 375 Md. at 84, 86, 96. *SYL* and *Gore* teach us that the flow of money back to the parent can be evidenced in several different ways, such as dividends and loans. *See Gore*, 437 Md. at 515. At its core, this inquiry is whether the parent is the one who controls the flow of money and ultimately receives back the money paid to the subsidiary, subject to any expenses incurred by the subsidiary.

Third, a court should consider how much the subsidiary relies on the parent for its core functions and services. Included in the core functions utilized by the subsidiary are office space and equipment, personnel, and corporate services. *Id.*; *SYL*, 375 Md. at 86-88, 96. The corporate services provided by the parent can include cash management, marketing, purchasing, accounting, payroll, tax services, research and development, and human resources. *Gore*, 437 Md. at 515; *SYL*, 375 Md. at 95-96.

The last factor is a "catch all" to the rest—whether the subsidiary has substantive activity that is "in any *meaningful* way separate from" its parent. *Gore*, 437 Md. at 517 (emphasis added). Here, a court should consider whether the subsidiary creates, invents,

19

or makes anything that is independent of the parent company. *Id.* at 516; *SYL*, 375 Md. at 106. Also important is whether there exists functional integration and control by the parent through stock ownership, as well as common officers, directors, and employees. *See Gore*, 437 Md. at 515; *SYL*, 375 Md. at 98. In sum, a court should consider the subsidiary's overall dependence on the parent in the former's structure and operations. *See Gore*, 437 Md. at 521; *SYL*, 375 Md. at 106.

### D. *Tax Court's Ruling in the Instant Case*

After a two-day hearing that consisted of factual stipulations, testimony, and thousands of pages of exhibits, the Tax Court issued a Memorandum of Grounds for Decision. In considering whether Brands had economic substance as a business entity separate from ConAgra, the court made the following factual findings:

> In April, 1996, ConAgra incorporated Brands to hold and enforce trademarks, conduct central advertising for corporate brands, and achieve other corporate efficiencies, including tax savings. Brands was capitalized by ConAgra[ ], which also provided its board of directors and officers from among the corporate executive corps. In late 1996, the parent and three ConAgra subsidiaries – Beatrice Foods, Inc., Hunt-Wesson, and Swift-Eckrich contributed 46 trademark groups to Brands in exchange for 2,207 shares of [Brands's] common stock. Thereafter, Brands held the 46 initial trademark groups and subsequently acquired numerous others from these entities.
>
> Brands was physically housed on the ConAgra corporate campus in Omaha. It rented space and equipment from the corporate parent. Brands had its own officers, who were actually paid by Brands, although their payroll was serviced by corporate. Brands gradually acquired several employees, and had as many as 23 employees in the latter part of the period in question.
>
> Brands licensed the ConAgra trademarks back to the ConAgra subsidiaries from which they had been acquired, although in a few

20

cases, Brands also licensed ConAgra trademarks to third-party corporations. Brands['s] most significant activity was conducting national advertising campaigns for the trademark brands. Brands'[s] employees performed quality control for the licensed brands, and monitored trademark infringements over the time periods in question. In exchange for the licensed trademarks, the licensees paid annual royalties to Brands, which was the primary source of Brands'[s] income, all of which was paid back to the ConAgra parent in the form of inter-company payments of various types.

Brands was organized in part to obtain a reduction in taxes. One of the advantages of organizing and using [Brands] to own and manage trademarks for the ConAgra family of companies was a potential royalty deduction from income taxes that would be claimed by ConAgra companies in those states that did not require combined income tax reporting.

Brands was entirely owned, directly and indirectly, by ConAgra [ ], the parent corporation. ConAgra itself held 1,000 shares of Brands (45%), while the remaining 1,207 shares were owned by three of ConAgra's wholly owned subsidiaries, Swift-Eckrich, Inc., Hunt-Wesson, Inc., and Beatrice Cheese, Inc. In its fiscal year ending May, 1997 through May, 2004, [Brands] received millions of dollars of royalty income from ConAgra companies doing business and filing tax returns in Maryland.

The evidence suggests during the entire period at issue, ConAgra utilized centralized legal services, tax services, human resources (including payroll), treasury functions, cash management, marketing, corporate relations, information services, research & development, purchasing, accounting, and general corporate management. In fact, Brands itself was organized for the purpose of centralizing control over trademarks and conducting centralized national advertising ConAgra-wide.

ConAgra corporate executives were routinely assigned to interlocking directors' boards of the several subsidiary corporations; officers were assigned to various subsidiaries from an existing central pool of executives; and many corporate officers were assigned as special portfolio officers to numerous subsidiaries.

ConAgra [ ] had a vice-president for taxes. That officer was simply assigned as the vice president for taxes to Brands and to many

other subsidiaries.  Likewise, ConAgra[ ]'s corporate secretary was cross-assigned as the corporate secretary for Brands, Hunt-Wesson, Swift-Eckrich, and Beatrice Foods.  Kenneth DiFonzo testified by deposition that he was assigned as an officer and director to so many different subsidiaries that he could only recall the names of a few of the subsidiaries to which he was assigned.  The annual assignment of officers to subsidiaries [was] effectively carried out by the ConAgra [ ] corporate secretariat, which circulated "consents in lieu of" annual meetings and boards of the various entities signed the consents.

**From a revenue standpoint, Brands depended for the vast majority of its annual revenue on royalty payments from ConAgra and its subsidiaries.  All profits from its operation were transferred back to ConAgra in annual payments called "cost of capital" payments and through other internal financial arrangements.  The payments to and from ConAgra and its subs, and to and from Brands in particular, were entirely circular.**

**Brands could not have functioned as a corporate entity without the support services its received from "corporate."  All of Brands'[s] everyday support services – ranging from its physical housing to payroll, accounting, cash management, tax services, funding of legal services, capital requirements, financing, executive staffing, and information services – were supplied by its corporate parent.**

**The facts indicate functional integration and control through stock ownership, as well as common employees, directors and officers.  The functional source of Brands['s] income is derived from the ideas and discoveries generated by ConAgra Corporate.  The circular flow of money is traced by and through the valuable trademarks.**

**In addition, the facts also indicate Brands'[s] reliance on ConAgra corporate personnel, office space and corporate services.  The tax returns and other financial data reflect the lack of separate substantial activity of Brands.**

(Emphasis added).

From the above facts, the Tax Court concluded that Brands was sufficiently similar to the subsidiary companies in *SYL* and *Gore*, and thus "lacked any economic substance *separate from its parent(s)*." (Emphasis in original). Accordingly, the Tax Court held that Brands was subject to income taxation by Maryland.

### E. *Challenges to the Tax Court's Factual Findings*

Unlike the subsidiaries in *SYL* and *Gore*, Brands begins its attack on the Tax Court's decision by challenging several of the court's factual findings. First, Brands argues that there is not substantial evidence to support the following findings by the Tax Court: 1) "[I]n exchange for the licensed trademarks, the licensees paid annual royalties to Brands, which was the primary source of Brands'[s] income, all of which were paid back to the ConAgra parent in the form of inter-company payments of various types[;]" and 2) "[A]ll profits from its operation were transferred back to ConAgra in annual payments called 'cost of capital' payments and through other internal financial arrangements. The payments to and from ConAgra and its subs, and to and from Brands in particular, were entirely circular." (Some alterations in original) (emphasis omitted). Brands contends that "the record clearly reflects that Brands neither paid dividends to its shareholders nor made any loans to ConAgra or any of its affiliates." According to Brands, the record "clearly reflects that Brands made no payments for 'cost of capital.'" In short, Brands's first argument appears to challenge the Tax Court's ultimate factual finding that Brands and ConAgra had a circular flow of money.

At the outset, we observe that the Tax Court did not make any factual findings pertaining to dividends or loans from Brands to ConAgra, and therefore, conclude that

23

there is no merit to Brands's assertion that the court made any such findings. We agree with Brands that the record does not reflect that there were any "cost of capital" payments made by Brands. Nevertheless, there is substantial evidence to support the Tax Court's ultimate factual finding that there was a circular flow of money between Brands and ConAgra.

The Tax Court found that the royalties paid to Brands by ConAgra and its subsidiaries were paid back to ConAgra "in the form of *inter-company payments* of various types" and "*through other internal financial arrangements*." (Emphasis added). These "inter-company payments" and "other internal financial arrangements[,]" in our view, refer to the cash management system that ConAgra and its subsidiaries, including Brands, employed. Eric Johnson, the "Senior Director in the Corporate Tax Department for ConAgra[,]" testified at the Tax Court hearing about the cash management system, explaining in relevant part:

> [BRANDS'S COUNSEL]: Could you explain to us what a cash management system is and how it works?
>
> [JOHNSON]: In a multi-entity organization like ConAgra, we utilize a central cash management system to manage cash. And so, in our structure, ConAgra [ ] basically serves as the bank.
>
> [BRANDS'S COUNSEL]: Is ConAgra [ ] the parent?
>
> [JOHNSON]: I'm sorry. ConAgra [ ], the parent company, serves as the bank, if you will. **And to the extent a subsidiary either earns revenue or cash, that cash is swept up to ConAgra [ ]. To the extent a subsidiary needs to use cash, the cash comes down from ConAgra [ ]. ConAgra [ ] takes, if we're lucky, excess cash, invests that, or it's the ultimate entity that goes out and get[s] loans to the extent we need loans from third parties to operate.**

24

[BRANDS'S COUNSEL]:  Is [ ] Brands a cash user or a cash generator?

[JOHNSON]:  [ ] Brands is a cash generator.

[BRANDS'S COUNSEL]:  So their cash would be swept by ConAgra [ ] into a central bank?

[JOHNSON]:  That's correct.

[BRANDS'S COUNSEL]:  And how is that reflected on [ ] Brands'[s] accounting records?

[JOHNSON]:  It's through what we call an inter-company account. And so if you look at…[ ] Brands'[s] balance sheet, you will see, I believe it's categorized in the other current assets, an inter-company account that basically accumulates all those cash sweeps or cash receipts going either way through those accounts.

[BRANDS'S COUNSEL]:  So if we were to look at a balance sheet for [ ] Brands, we would find an asset there that reflects the cash?

[JOHNSON]:  Yes.

(Emphasis added).

Johnson further explained the relationship of the cash management system and Brands's net royalty income as reflected on Brands's balance sheet:

[BRANDS'S COUNSEL]:  So if I were to look at the balance sheets that are attached to these federal returns, would I see a continual growth in retained earnings which reflects the net income that Brands has earned in each year?

[JOHNSON]:  Yes.

[BRANDS'S COUNSEL]:  Okay.  And then, as far as the cash is concerned, that might be reflective of the royalty income that's swept pursuant to the centralized cash management system?

25

[JOHNSON]:  That's true.

[BRANDS'S COUNSEL]:  Okay.

[JOHNSON]:  So retained earnings is basically increased by net income and would be decreased by net losses.  It could be from our returns, it could also be decreased by a distribution.

[BRANDS'S COUNSEL]:  But I believe you indicated there were no distributions, that everything's swept.

[JOHNSON]:  Yes.  For [ ] Brands there are no distributions.

[BRANDS'S COUNSEL]:  And then is there an asset on the balance sheet that reflects the cash sweep?

[JOHNSON]:  There's an asset on the balance sheet that reflects the cash, basically, any cash movements.  So cash sweeps, any payment of expenses that [ ] Brands had that cash came down from [ConAgra] called the inter-company account.

Kenneth DiFonzo, ConAgra's Vice President, also testified about the cash management system in his deposition, portions of which were admitted into evidence by stipulation.  DiFonzo explained that ConAgra subsidiaries did not pay dividends, because it would have "created additional accounting where none was needed," and the cash management system produced the same result.  DiFonzo confirmed the operation of the cash management system: "*Every single dollar that flowed into the cash coffers of [the subsidiaries] and thereby into the company, they were given interest credit for.*  Every single dollar that they expended they were charged for."  (Emphasis added).

Taking the testimonies of Johnson and DiFonzo together, the evidence showed that the royalties paid to Brands by ConAgra and its subsidiaries were immediately "swept up

to ConAgra," and except for the cash needed to pay Brands's expenses and the "interest credit" given to Brands, there was no expectation of a repayment to Brands nor any limitations on ConAgra's use of the cash. As a result, the cash management system allowed ConAgra to use all of Brands's net royalty income from the date of the latter's incorporation, which amounted to over $1.2 billion as of May 2004, according to the retained earnings listed on Brands's balance sheet.

As stated previously, we review the Tax Court's factual findings by determining whether they are supported by substantial evidence.[9] *Gore*, 437 Md. at 504. We conclude that based on this record, "a reasoning mind could have reached the factual conclusion" of the Tax Court that there was a circular flow of money, *i.e.*, royalties, from ConAgra and its subsidiaries to Brands and back to ConAgra.

Second, Brands contends that there is "nothing in the record supporting" the Tax Court's finding that "Brands could not have functioned as a corporate entity without the support services it received from 'corporate' and that among other things, physical housing, payroll and funding of legal services were 'supplied by its corporate parent.'" According to Brands, the record demonstrates that Brands paid ConAgra for all of the services that ConAgra provided.

---

[9] Although both parties agree that Brands's challenges pertain to the Tax Court's factual findings, we note that, even if Brands's challenges could be considered challenges concerning a mixed question of law and fact, our conclusion would not be altered, because we also review mixed questions of law and fact under a substantial evidence standard. *See Gore*, 437 Md. at 504-05.

27

Based on Brands's citation to the record, Brands is challenging the following factual finding of the Tax Court:

> Brands could not have functioned as a corporate entity without the support of services it received from "corporate." All of Brands['s] everyday support services – ranging from its physical housing, to payroll, accounting, cash management, tax services, funding of legal services, capital requirements, financing, executive staffing, and information services – were supplied by its corporate parent.

The above finding of the Tax Court did not address whether Brands paid for the services supplied by ConAgra. It simply stated that ConAgra "supplied" certain services. In a stipulation filed in the Tax Court, Brands agreed to the following facts: "ConAgra [ ] was a parent company with corporate functions, including tax services, human resources services, treasury functions, cash management, marketing, corporate relations, information services, and general management. These services were supplied to the parent company's subsidiaries." Brands further stipulated that ConAgra supplied additional services to Brands from 1996 to 2005, including "central purchasing[,]" "centralized advertising[,]" "centralized accounting[,]" "reviewed significant contracts[,]" "centralized corporate research and development[,]" and "supplied human resources services … includ[ing] payroll services." Accordingly, there was substantial evidence for the Tax Court to find that ConAgra *supplied* Brands with the above-referenced services.

Lastly, Brands argues there is not substantial evidence to support the Tax Court's finding that "Brands'[s] tax returns and other financial data reflect the lack of separate substantial activity of Brands." Brands contends that its tax returns and financial records reflect that it paid employees, paid rent, accrued expenses, and owned assets.

28

Consistent with Brands's assertion, the Tax Court did make factual findings that Brands had expenses for rent and employees. Such findings, however, do not undermine the court's factual conclusion that Brands lacked substantive activity separate from ConAgra and its wholly owned subsidiaries. For example, the court found that "[t]he functional source of Brands['s] income is derived from the ideas and discoveries generated by ConAgra"— not the ideas and discoveries of Brands. Indeed, Brands stipulated that ConAgra conducted centralized research and development. Moreover, even though Brands had license agreements with third parties, these revenues generated less than one percent of Brands['s] revenue, except for 1997 when third party royalties generated just under four percent of Brands's revenue. As the Court of Appeals has instructed, "[i]t is not our place to make an independent original estimate of or decision on the evidence[,]" and we decline to do so here, especially when Brands has failed to direct this Court to any specific reference to the record, other than the broad statement that Brands incurred expenses, in its attempt to undermine the Tax Court's factual conclusion that Brands lacked substantive activity separate from ConAgra. *See Gore*, 437 Md. at 504 (some alterations in original) (internal quotation marks omitted).

## F. *Analysis*

Brands argues that the Tax Court erred in relying on *SYL* and *Gore* to conclude that Brands lacked economic substance as a business entity separate from ConAgra. Specifically, Brands contends that, unlike the subsidiaries in *Gore* and *SYL*, (1) Brands's income was not solely from ConAgra but from ConAgra's subsidiaries and third parties; (2) Brands did not issue dividends or loans; (3) Brands promoted, marketed, and defended

29

its intellectual property; (4) Brands incurred operating expenses relative to its income; (5) the motivation behind forming Brands extended beyond taxation; and (6) Brands had twenty-three employees.[10] Brands further contends that the Tax Court placed too much emphasis on the fact that ConAgra provided Brands with many administrative functions, because "it is common in today's corporate world that administrative functions are centralized to provide efficiencies for the entire group." We are not persuaded.

In its opinion, the Tax Court found that "Brands depended for the vast majority of its annual revenue on royalty payments from ConAgra and its subsidiaries." Royalty payments were generated solely because (1) ConAgra and three subsidiaries assigned Brands their trademarks in exchange for Brands's stock, and (2) Brands licensed the same trademarks back to ConAgra and those subsidiaries. The fact that the subsidiaries, or their successors, paid royalties to Brands does not call into question the Tax Court's finding, because the subsidiaries were wholly owned by ConAgra and the royalty payments flowed from the subsidiaries to Brands and then back to ConAgra. The court did consider third party revenues, but again found that the "vast majority" of Brands's revenue came from ConAgra and its subsidiaries. In *Gore*, the Tax Court acknowledged that there were royalty payments to GEH from third parties but determined that the payment of royalties from third

---

[10] In its Brief, Brands broadly asserts several other "facts" that it contends are supported by the record, and that the Tax Court should have considered in its ruling. Brands, however, does not provide any argument as to why the court should have made those factual findings. As previously stated, "it is the agency's province to resolve conflicting evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences." *Gore*, 437 Md. at 504. We will, therefore, review the court's ruling based on its "findings and reasons set forth" in its opinion. *Id.* at 503.

parties did not negate GEH's "dependence on Gore for [its] income." *Gore*, 437 Md. at 517. Similarly, the Tax Court had substantial evidence to conclude that Brands was dependent on ConAgra and its subsidiaries for Brands's income; Brands's third party revenue never exceeded four percent in any tax year.

As described in detail above, the Tax Court found that there was a circular flow of money from ConAgra and its subsidiaries to Brands and back to ConAgra. We concluded that there was substantial evidence for the Tax Court to make such a finding. Brands is correct that it did not pay dividends or make loans, as was the case with the subsidiaries in *SYL* and *Gore*. *See SYL*, 375 Md. at 85-86, 96; *Gore*, 437 Md. at 515. In the instant case, however, paying dividends or making loans was not necessary to create the circular flow of money, because the cash management system produced the same result. All of the cash received by Brands was "swept up to ConAgra," and only the cash needed for expenses was returned to Brands. Therefore, Brands was similar to the subsidiaries in *SYL* and *Gore* with regard to the circular flow of money between the parent and subsidiary.

The Tax Court acknowledged that "Brands['s] most significant activity was conducting national advertising campaigns for the trademark brands. Brands['s] employees performed quality control for the licensed brands, and monitored trademark infringements over the time periods in question." Nevertheless, the court found that there was "functional integration and control [by ConAgra] through stock ownership, as well as common employees, directors and officers." The court elaborated: "ConAgra corporate executives were routinely assigned to interlocking directors' boards of the several subsidiary corporations; officers were assigned to various subsidiaries from an existing

31

central pool of executives; and many corporate officers were assigned as special portfolio officers to numerous subsidiaries." Specifically, the vice president of tax for ConAgra was also assigned to be the vice president of tax for Brands. The secretary for ConAgra was also assigned to be the secretary for Brands, Hunt-Wesson, Swift-Eckrich, and Beatrice Foods. Moreover, DiFonzo, the ConAgra vice president and member of the board of directors for Brands, testified that "he was assigned as an officer and director to so many different subsidiaries that he could only recall the names of a few of the subsidiaries to which he was assigned." The court also found that "[t]he functional source of Brands['s] income [was] derived from the ideas and discoveries generated by ConAgra[.]" Like *Gore*, ConAgra "permeates the substantive activities" of Brands. *Gore*, 437 Md. at 519-20.

Although Brands was organized to centralize control over the trademarks used by ConAgra and its subsidiaries, the Tax Court found that "Brands was [also] organized in part to obtain a reduction in taxes." Brands appears to argue that the Tax Court should have given more weight to the "non-tax business reasons for establishing Brands." The Court of Appeals, however, explained in *Gore* that "the motivation behind creating the entities…is not dispositive." *Id.* at 519. In our view, the court properly considered the motives behind Brands's creation.[11]

---

[11] Brands also appears to argue that it is distinguishable from the subsidiaries in *Gore* because Brands paid state income taxes while the subsidiaries in *Gore* and *SYL* did not pay any state income taxes. Brands does not elaborate further, but to the extent that it is arguing that paying taxes lessens tax avoidance as a motive for Brands's formation, we reject that argument because, as stated above, the motivations behind Brands's formation are not dispositive. *Gore*, 437 Md. 519.

The Tax Court further acknowledged that Brands had twenty-three employees in the latter part of the tax period in question. Brands argues that its twenty-three employees is an important factor in determining economic substance, but Brands fails to direct this Court to, and did not adduce before the Tax Court, any evidence demonstrating the nature of these employees' duties or the compensation of each employee. *See id.* at 520-21 (determining that the Tax Court did not err in addressing only certain aspects of third party activity because of the lack of "specificity and comprehensiveness" of the record). The mere number of employees, without more, does not convince us that Brands is sufficiently distinguishable from the subsidiaries in *SYL* and *Gore*.

Finally, the Tax Court found that Brands relied on ConAgra for most, if not all, of its administrative functions. Brands argues that the court placed too much emphasis on this factor, but we disagree with this interpretation of the court's opinion. As outlined above, the court took into consideration many factors other than the administrative functions that ConAgra provided Brands in arriving at its conclusion that Brands lacked economic substance as a separate business entity.

Therefore, we hold that there was substantial evidence to support the Tax Court's findings of (1) Brands's dependence on ConAgra and its subsidiaries for the "vast majority" of its income, (2) the circular flow of money from ConAgra and its subsidiaries to Brands and back to ConAgra, (3) Brands's reliance on ConAgra for its core functions, and (4) Brands's lack of any meaningful substantive activity separate from ConAgra. From those factual findings, the court properly applied the teachings of *SYL* and *Gore* to conclude that Brands lacked economic substance as a business entity separate from ConAgra.

Because a portion of Brands's income was produced from the business activity of ConAgra and its subsidiaries in Maryland, the court correctly held that there was a sufficient nexus and minimum contacts to justify Maryland's taxation of that portion of Brands's income.

Nevertheless, Brands makes two additional challenges to the Tax Court's ruling that we must address. The first challenge is that the court applied the unitary business principle in determining that Brands lacked economic substance as a separate entity. According to Brands, the court focused solely on the relationship between Brands and ConAgra and its subsidiaries and not enough on whether Brands had substantial economic activity. We disagree.

The Court of Appeals explained in *Gore* that "[t]he unitary business principle enables taxation by *apportionment* when the characteristics of functional integration, centralized management, and economies of scale are present." *Id.* at 508 (emphasis added) (internal quotation marks omitted). "[T]he principle does not confer nexus to allow a state to **directly** tax a subsidiary based on the fact that the **parent** company is taxable and that the **parent and subsidiary are unitary**." *Id.* at 509 (emphasis in original). In other words, the unitary business principle is not sufficient to satisfy the "minimum contacts" and "nexus" requirements of the Due Process Clause and the Commerce Clause. *Id.* The Court did, however, hold in *Gore* that,

> [a]lthough the unitary business principle and economic substance inquiry under *SYL* are distinct inquires with distinct purposes, there is no reason—based either in case law or logic—for holding that the factors that indicate a unitary business cannot also be relevant in determining whether subsidiaries have no real economic substance as separate business entities.

*Id.* at 518.

We do not read the Tax Court's opinion as using factors that are only applicable to the unitary business principle. The court expressly stated that "the unitary business principle does not confer nexus to allow a state to directly tax a subsidiary[.]" It is this Court's view that the Tax Court properly considered those factors set forth in *SYL* and *Gore* and did not apply the unitary business principle in its analysis of Brands's economic substance as a separate business entity.

Brands's last attempt to distinguish *Gore* and *SYL* is to attack the nexus of ConAgra and its subsidiaries with Maryland. Brands argues that, unlike the companies at issue in *SYL* and *Gore*, "neither ConAgra, nor any of its affiliates, operated retail stores or manufacturing plants in Maryland." Brands continues: "Because none of Brands['s] licensees operated retail stores or manufacturing plants in Maryland, they did not use the Intangible Assets in Maryland." In essence, Brands argues that without ConAgra or its subsidiaries having a physical presence in Maryland, Brands does not have a sufficient nexus or minimal contacts with the State and Brands did not earn income from the business operations of ConAgra and its subsidiaries in Maryland. Brands's argument is without merit.

We acknowledge that in *Gore*, Gore operated factories in Maryland and presumably, although not explicitly stated, filed Maryland tax returns. *Id.* at 500. In *SYL*, Crown Parent had Maryland manufacturing plants, and Syms operated retail stores in Maryland. *SYL*, 375 Md. at 81, 92. The Court of Appeals, however, noted in *SYL* that both parent companies filed Maryland taxes for the years in question. *Id.* The United States Supreme

Court made clear in *Wayfair* that there is no physical presence requirement for a state to tax a corporation under the Due Process Clause or the Commerce Clause. 138 S. Ct. at 2094 ("Rejecting the physical presence rule is necessary to ensure that artificial competitive advantages are not created by this Court's precedents. This Court should not prevent States from collecting lawful taxes through a physical presence rule that can be satisfied only if there is an employee or a building in the State."). In the instant case, the parties stipulated that ConAgra "conducted operations in Maryland" and filed corporation income tax returns in Maryland. The parties also stipulated that certain subsidiaries of ConAgra filed Maryland corporation income tax returns. In our view, the "operations" of ConAgra in Maryland and the filing of Maryland corporation income tax returns by ConAgra and its subsidiaries in Maryland are sufficient to establish that those companies conducted income generating activities within the State, and their lack of a physical presence in Maryland does not sever the nexus between Brands and Maryland. *See Classics Chicago, Inc. v. Comptroller*, 189 Md. App. 695, 715-16 (2010) ("[T]he basis of a nexus sufficient to justify taxation . . . was the economic reality of the fact that the parent's business in the taxing state was what produced the income of the subsidiary.") Accordingly, we find no error in the Tax Court's ruling.

### III.  Apportionment Formula

#### A. *A Brief Background on Income Tax Apportionment*

To understand the Comptroller's assessment, we find it useful to summarize in general terms the mechanics of how Maryland corporate income tax is calculated when a

corporation conducts business both in and outside of the State.[12]  And more specifically,

what an apportionment formula is under Maryland law.  In doing so, we will review the

statutory and regulatory landscape applicable to the taxing years of 1996 to 2003.[13]

Generally, in calculating the taxable income of a corporation, one begins with the

corporation's federal taxable income.  Md. Code (1988, 1996 Supp.), § 10-304(1) of the

Tax General Article ("TG").  From the federal taxable income, adjustments, if applicable,

are made to either increase or decrease the Maryland taxable income.  TG §§ 10-304-310.

The result of these adjustments is called the corporation's "Maryland modified income."

TG § 10-301, 304.

In the relevant tax years, the Tax General Article provided that, when a corporation

conducts "business in and out of the State, the corporation shall allocate to the State the

part of the corporation's Maryland modified income that is derived from or reasonably

attributable to the part of its trade or business carried on in the State[.]" TG § 10-402(a)(2),

---

[12] As one might imagine, the calculation of the ultimate tax levied against a corporation can be very complicated, from the adjustments to the tax credits to the exemptions.  And of course, depending on what type of business the corporation engages in, there could be different methods of calculating Maryland income tax.

[13] From 1996 to 2000, the relevant, applicable statutes in this case were not changed. In 2001, however, the General Assembly adopted 2001 Md. Laws Ch. 633, which amended Maryland Code (1988, 1994 Repl. Vol., Supp. 2000), § 10-402 of the Tax General Article ("TG").  Most notable was the addition of "or the single sales factor formula method" to Section 10-402(d)(2).  *See* 2001 Md. Laws Ch. 633.  These amendments and their applicability to the apportionment of income were not argued in this appeal and thus such amendments do not alter our conclusion.

*amended by* 2018 Md. Laws Ch. 341-42.[14] There are three methods of apportionment. The first is called "separate accounting[,]" which is applied if "[i]t is practical[] and [t]he activity of the corporation within this State is nonunitary." TG § 10-402(b), *amended by* 2018 Md. Laws Ch. 341-42;[15] COMAR 03.04.03.08(F)(3). Given the unitary business of Brands, ConAgra, and the latter's subsidiaries in Maryland, separate accounting is not used.

The second formula is called the "three-factor apportionment formula." TG § 10-402(c), *amended by* 2018 Md. Laws Ch. 341-42.[16] As explained by the Court of Appeals in *NCR Corp. v. Comptroller*, the three-factor apportionment formula is determined

> by using [ ] three-factor[s] (sales, property and payroll) . . . each "factor" being a fraction. The numerator of the sales factor, for example, is the amount of a corporation's in-state sales; the denominator of the sales factor is the total amount of a corporation's in-state and out-of-state sales. The property and payroll factors are computed in the same manner.

---

[14] In 2018, the General Assembly made amendments to TG § 10-402. The amendments made only stylistic changes to TG § 10-402(a)(2) and recodified it as TG § 10-402(b)(2). *See* 2018 Md. Laws Ch. 341 at 1604. In this opinion, we will refer to the statutory provisions as they were codified during the relevant tax years.

[15] This provision was unchanged by the 2018 amendments and is now codified as TG § 10-402(c)(1). *See* 2018 Md. Laws Ch. 341 at 1604.

[16] Although the 2018 amendments did not change the basic structure of the 3-factor formula, they did change the amount by which the sales factor is multiplied, as well as the total denominator. Because the Comptroller, in its discretion, chose not to use the 3-factor formula in the instant case, and we uphold that choice, *see* Section III.C, *infra*, these changes do not affect our analysis herein. *See* 2018 Md. Laws Ch. 342 at 1615-16.

313 Md. 118, 141 (1988); *see also* TG § 10-402(c), *amended by* 2018 Md. Laws Ch. 341-42; COMAR 03.04.03.08(C). To calculate the apportionment factor, one must average the property factor, payroll factor and "twice the sales factor." TG § 10-402(c), *amended by* 2018 Md. Laws Ch. 341-42. In other words, the apportionment factor is calculated as follows:

$$\left(\left(\frac{Maryland\ Sales}{All\ Sales} \times 2\right) + \frac{Maryland\ Property}{All\ Property} + \frac{Maryland\ Payroll}{All\ Payroll}\right) \div 4$$

*See NCR*, 313 Md. at 141 (expressing the three-factor formula in place at the time prior to the 1992 amendments in a similar manner). This apportionment factor is then multiplied by the Maryland modified income. *Id.* at 142; TG § 10-301.

The third apportionment formula is an altered formula that is created by the Comptroller in his or her discretion, as provided for in TG § 10-402(d):[17]

> (d) *Determination — by Comptroller. —* To reflect clearly the income allocable to Maryland, the Comptroller may alter, if circumstances warrant, the methods under subsections (b) and (c) of this section, including:
>     (1) the use of the separate accounting method;
>     (2) the use of the 3-factor double weighted sales factor formula method or the single sales factor formula method;
>     (3) the weight of any factor in the 3-factor formula;
>     (4) the valuation of rented property included in the property factor; and
>     (5) the determination of the extent to which tangible personal property is located in the State.

---

[17] The 2018 amendments made no changes to this provision, but recodified it as TG § 10-402(e). *See* 2018 Md. Laws Ch. 341 at 1611.

Once one of these formulas is applied, the result is the corporation's Maryland taxable income. TG § 10-301. The applicable corporate tax rate (seven percent from 1996 to 2003) is then applied to a corporation's Maryland taxable income resulting in the tax owed to the State. TG § 10-105(b), *amended by* 2007 (Special Session) Md. Laws Ch. 3.[18]

B. *The Assessment and the Tax Court's Ruling in Brands*

Before the Tax Court, it was stipulated that, on August 30, 2007, the Comptroller assessed Brands the following taxes, interest, and penalties:

| Tax year | Tax | Int. to 7/15/07 | 25% Penalty | Total |
|---|---|---|---|---|
| 1996 | $49,530 | $63,841 | $12,383 | $125,754 |
| 1997 | 127,757 | 148,063 | 31,939 | 307,759 |
| 1998 | 128,017 | 131,723 | 32,004 | 291,744 |
| 1999 | 146,120 | 131,302 | 36,530 | 313,952 |
| 2000 | 137,500 | 105,731 | 34,375 | 277,606 |
| 2001 | 292,066 | 186,616 | 73,017 | 551,699 |
| 2002 | 270,871 | 137,861 | 67,718 | 476,450 |
| 2003 | 260,116 | 98,479 | 65,029 | 423,624 |
| Grand totals | $1,411,977 | $1,003,616 | $352,995 | $2,768,588 |

It was further stipulated that after the above assessment was affirmed by the Comptroller in 2009, the following was the assessment:

---

[18] In 2007, the General Assembly amended the Tax General article to increase the corporate tax rate to 8.25%. 2007 (Special Session) Md. Laws Ch. 3 at 82. Because this change only applies to tax years beginning after December 31, 2007, it does not affect the amount of tax due in the instant case.

| Tax year | Tax | Int. to 10/31/08 | 25% Penalty | Total |
|---|---|---|---|---|
| 1996 | $49,530 | $73,826 | $12,383 | $125,754 |
| 1997 | 127,757 | 173,817 | 31,939 | 307,759 |
| 1998 | 128,017 | 157,529 | 32,004 | 291,744 |
| 1999 | 146,120 | 160,758 | 36,530 | 313,952 |
| 2000 | 137,500 | 133,448 | 34,375 | 277,606 |
| 2001 | 292,066 | 245,492 | 73,017 | 551,699 |
| 2002 | 270,871 | 192,465 | 67,718 | 476,450 |
| 2003 | 260,116 | 150,915 | 65,029 | 423,624 |
| Grand totals | $1,411,977 | $1,288,250 | $352,995 | $3,053,222 |

In considering the Comptroller's assessment, the Tax Court made the following ruling:

> Where nexus is satisfied as in the present case, the Maryland tax on a multi-state corporation engaged in interstate business is governed by Md. Code Ann., Tax-Gen. [("TG")] § 10-402 ([1988,] 2010 Repl. Vol.). In TG § 10-402, Maryland provides for both separate accounting and formulaic apportionment as methods for allocating the income of a foreign corporation doing business in the State. *See* TG § 10-402(b) & (c). Formulaic apportionment, unlike separate accounting, does not purport to identify the precise geographical source of a corporation's profits; rather, it is employed to approximate a corporation's income that is reasonably related to the activities conducted within the taxing State. TG § 10-402(d) requires that net income be apportioned to this state on the basis of a formula that clearly reflects the income allocable to Maryland. The Comptroller may alter, if circumstances warrant, the methods of allocating income to Maryland. TG § 10-402(d); COMAR § 03.04.03.08F.

> The Comptroller's auditors found that with respect to Brands, there were no recorded Maryland sales, no recorded Maryland payroll, and no recorded Maryland property. As a result, **application of the statutory "3-factor apportionment formula" provided by TG § 10-402(c) would have yielded an apportionment factor of zero. Since a zero apportionment factor**

41

**would not have "reflect[ed] clearly the income allocable to Maryland," the Comptroller's agents formulated a blended apportionment factor. The blended apportionment factor utilized by the Comptroller in allocating Brands'[s] income was derived directly from the income tax returns of the five ConAgra entities that filed in Maryland. The Court finds that the Comptroller effectively utilized ConAgra's own apportionment figures in constructing the blended apportionment factor used in this case.** There is no clear and convincing evidence that the Comptroller's blended apportionment factor is unfair.

(Some alterations in original) (Emphasis added).

### C. *Brands's Challenges to the Apportionment Formula*

Brands first contends that the Comptroller's apportionment formula was not permitted under TG § 10-402(d). Brands acknowledges that TG § 10-402(d) permits the Comptroller to deviate from the three-factor formula set forth in § 10-402(c), but argues that the Comptroller failed to demonstrate that the use of the three-factor formula did not clearly reflect Brands's Maryland income.

The Comptroller responds that "TG § 10-402(d) requires that net income be apportioned to this State on the basis of a formula that clearly reflects the income allocable to Maryland. The Comptroller may alter, if circumstances warrant, the methods of allocating income to Maryland." The Comptroller explains that the use of the three-factor apportionment formula for Brands would have yielded zeros for payroll, property, and sales in Maryland, "thus yielding an apportionment factor of zero." According to the Comptroller, an apportionment factor of zero would not have reflected clearly Brands's income allocable to Maryland. The Comptroller concludes that a blended apportionment

42

factor derived from the Maryland income tax returns of ConAgra and its subsidiaries was appropriate. We agree with the Comptroller.

In *Gore*, GEH and FVI argued that the Comptroller improperly borrowed an apportionment formula from Gore to create GEH and FVI's apportionment formula. 437 Md. at 528-29. Like Brands, GEH and FVI advocated an apportionment based upon their property and payroll in Maryland, which would have produced an apportionment factor of zero. *Id.* GEH and FVI claimed that the Comptroller's apportionment formula ignored the binding regulation of COMAR 03.04.03.08(C)(3)(d). *Id.*

The Court of Appeals rejected the argument of GEH and FVI:

> Both TG § 10–402 and COMAR 03.04.03.08 are provisions with exceptions. TG § 10–402(d) allows the Comptroller to "alter, if circumstances warrant, the methods under subsections (b) and (c) of this section[.]" COMAR 03.04.03.08(F)(1) allows the Comptroller to alter both a formula or its components where an apportionment formula "does not fairly represent the extent of a corporation's activity in [the] State[.]" **As Respondent correctly points out, the three-factor formula . . . would have yielded an apportionment factor of zero, which did not fairly represent the subsidiaries' activity in Maryland. Thus, a plain reading of either the statute or regulation empowers the Comptroller to do precisely that to which Petitioners object.**

*Id.* at 529 (some alterations in original) (emphasis added). Here, too, the Comptroller had the discretion to deviate from the three-factor apportionment formula, because an apportionment factor of zero did not accurately represent Brands's activity in Maryland.

Brands counters that, even if the Comptroller demonstrated the need to deviate from the three-factor formula, the Comptroller did not use a method permitted under TG § 10-402(d). The Comptroller responds that the Court of Appeals ruled in *Gore* that it was

43

permissible to use a parent company's apportionment factor in calculating a subsidiary's income tax when the three-factor formula produced a zero apportionment factor for the subsidiary.

TG § 10-402(d) provides that the Comptroller may alter an apportionment formula to "reflect clearly the income allocable to Maryland." In *Gore*, the Court of Appeals permitted the Comptroller to apply Gore's apportionment factor to calculate the Maryland taxable income for both GEH and FVI. 437 Md. at 533. In that case, the Court, quoting the Tax Court, explained the Comptroller's assessment as follows:

> The tax calculation utilized by the Comptroller was intended to apportion to Maryland only the Delaware Holding Company income connected to the operating transactions of W.L. Gore. Expenses were deducted from the income if the Delaware Holding Company made an affirmative demonstration that the expenses were directly related to the income. GEH made no attempt to allocate Delaware Holding Company expenses to the W.L. Gore connected income. Consequently, **GEH's tax liability was calculated by multiplying royalties paid by W.L. Gore times the W.L. Gore apportionment formula. For FVI, the tax is calculated by multiplying interest paid by W.L. Gore times the W.L. Gore apportionment formula.**

*Id.* at 529-30 (emphasis added).

Like in *Gore*, the Comptroller used the apportionment factor of Brands's parent company, ConAgra. *See id.* In the instant case, however, the Comptroller used what it terms a "blended apportionment factor," which was derived from the apportionment factors of ConAgra and its subsidiaries doing business in Maryland and paying Brands royalties. In her testimony before the Tax Court, Mary Wood, the Manager of Corporation Income Tax for the Comptroller, explained the origin and effect of the blended apportionment factor:

44

[WOOD]: This is the blended factor apportionment worksheet that I was talking about earlier where it lists on the left side where it shows all the parent affiliate companies, those are all of the Maryland filers that made payments to [ ] Brands [ ]. And, as I said, they're all blended together to come up with a factor that, again, it basically accounts for the same, it's the same tax due as if you took each company separately, but it's just combining them so it comes out to the same tax effect.

***

[COMPTROLLER'S COUNSEL]: Okay. And where did the factors come from that were blended?

[WOOD]: It's, as I said, basically, **it's the same as taking each company by itself using that company's Maryland apportionment factor, just as we did in SYL, Crown Delaware, Talbotts, Nordstrom, all of the cases that we've settled on.** So it's taking their Maryland factor and, again, it's just a blending of each company.

[COMPTROLLER'S COUNSEL]: Okay. **And what was the objective of the Auditors in making this blended factor?** What were they trying to do?

[WOOD]: **They were trying to get back the tax that we lost by the Maryland filer taking a deduction for the royalty expenses, just as we had in all those other cases.**

[COMPTROLLER'S COUNSEL]: Okay. Did this blended factor achieve that end?

[WOOD]: Absolutely.

(Emphasis added).

In our view, TG § 10-402(d) and the teachings of *Gore* permit the Comptroller to use the Maryland apportionment factor of ConAgra and its subsidiaries to determine a blended apportionment factor. Accordingly, the Comptroller did not err or abuse its discretion in utilizing a blended apportionment factor to calculate the income tax owed by

45

Brands to Maryland on royalty payments received from ConAgra and its subsidiaries arising out of their business in Maryland.

Lastly, Brands argues that the Comptroller's assessment is unfair and violative of the U.S. Constitution because it does not reflect how income was generated for Brands, and the Comptroller "imposes tax on Brands based [solely] on its affiliates' activities in Maryland." Brands also contends that, even if Maryland allowed a blended apportionment factor to be used, as in this case, "the requirement of the United States Constitution that the apportionment factors used 'actually reflect a reasonable sense of how income is generated' would not allow such result." The Comptroller responds that it is Brands's burden to demonstrate that the apportionment formula is unfair, and Brands has failed to cite anything in the record demonstrating that the apportionment formula used by the Comptroller is unfair. We agree with the Comptroller.

When a company is engaging in a unitary business, as in the case *sub judice*, the company "bears the burden of demonstrating that the income it seeks to exclude from taxation was derived from unrelated business activity that constituted a discre[te] business enterprise." *NCR*, 313 Md. at 132; *see also Gore*, 437 Md. at 531. Brands has failed to direct this Court to any evidence demonstrating that the Comptroller's assessment is unfair. Thus there was substantial evidence to support the Tax Court's decision upholding the Comptroller's income tax assessment against Brands.

A. *Background*

Under TG § 13-606, "[f]or reasonable cause, a tax collector may waive interest on unpaid tax."  In *Frey v. Comptroller*, 422 Md. 111, 184-85 (2011), *cert. denied*, 566 U.S. 905 (2012), the Court of Appeals stated that the authority to abate interest vests not just in the Comptroller, but in the Tax Court, too.  The Court explained that, when the Tax Court reviews the Comptroller's decision declining to abate interest in an assessment, the court's review "is deferential to the tax collector's discretion[,]" and the court must consider whether "the [complaining] party has demonstrated with affirmative evidence that reasonable cause exists or that the tax collector's decision was an obvious error."  *Id.* at 187.   Because the Tax Court in *Frey* did not consider whether Frey demonstrated reasonable cause to abate interest, the Court left open the question of what evidence was sufficient to demonstrate reasonable cause to waive interest.  *Id.*

B. *Tax Court's Ruling*

Before the Tax Court, Brands requested that the court abate interest on the tax assessments.  In its opinion, the court ruled:

> The final question for the [c]ourt's determination is whether interest and penalties should be waived under Tax-General Article Sections 13-606 (waiver of interest) and 13-714 (waiver of penalties).  In *Frey v. Comptroller of the Treasury*, 184 Md. App. 315, 421 (2009), the Court of Special Appeals referred to the reasonable cause exception set forth in the applicable statutes.  **The**

---

[19] When the Comptroller filed its cross-petition for judicial review in the circuit court, the Comptroller did not challenge the Tax Court's ruling abating penalties assessed against Brands.  Accordingly, the Tax Court's abatement of penalties is not before us in this appeal.

**[c]ourt finds that [Brands] has a reasonable basis for challenging the law and acted in good faith.** There was no intention on the part of [Brands] to cause delay in the collecting of taxes and this [c]ourt notes that numerous taxpayers have challenged the Comptroller's arguments. **The [c]ourt disagrees with the Comptroller that the state of the law was clear to the taxpayer at the time of the assessments.** To the contrary, the state of the law has evolved through various court decisions in *SYL*, *Crown Cork & Seal*[,] *The Classic Chicago, Inc. v. Comptroller of the Treasury*, 189 Md. App. 695 (2010), *Nordstrom, Inc. v. Comptroller of the Treasury*, (Md. Tax Ct. Oct. 24, 2008) and Gore Enterprise Holdings.

(Emphasis added). The court then ordered the abatement of all "interest after the date of filing this appeal in the Maryland Tax Court (February 23, 2009) until the date of this Order [February 24, 2015.]"

The Comptroller filed a cross-petition for judicial review in the circuit court. The Comptroller argued that the Tax Court did not use the proper standard for abating interest and that at the very least, the court should not have abated interested accruing after the issuance of the *Gore* opinion, which was on March 24, 2014. Brands contended that the Tax Court properly abated all interest until the date of that court's decision. The circuit court reversed the Tax Court's abatement of interest from the date of the issuance of the *Gore* opinion, March 24, 2014, until the date of the Tax Court's opinion in the instant case, February 24, 2015, a period of eleven months.[20]

---

[20] In considering the abatement of interest, the circuit court wrote in its Memorandum Opinion: "Brands shall be responsible for any and all interest collected after the date of the issuance of the *Gore* decision on March 24, 2014." The court's Order, however, stated that "[f]or the reasons stated in the foregoing opinion, . . . **ORDERED,** that the decision of the Maryland Tax Court, regarding the abatement of interest, is hereby **REVERSED.**" (Emphasis in original). The Memorandum Opinion and the Order, therefore, appear to be inconsistent, but because we review the holding of the Tax Court, we need not resolve this uncertainty. *See Gore*, 437 Md. at 503.

## C. *Challenges to the Waiver of Interest*

Brands argues that the Tax Court properly ruled that Brands had demonstrated reasonable cause to waive interest because "Brands had a reasonable basis to challenge the law and acted in good faith." Brands points out that "[t]here is no question that the assessments turned on the application and analysis of case law," and that the state of the case law was unclear during the tax years at issue "and even at the time of the assessment." Brands also contends that it "presented ample evidence, including two days of testimony and thousands of pages of exhibits, supporting that it had [a] reasonable basis to challenge the law, and the assessment of interest." Brands concludes that, given the broad discretion accorded to the Tax Court in determining "reasonable cause", as well as a lack of clarity in the case law, "the Tax Court properly exercised its discretion in waiving interest."

The Comptroller counters that "[b]oth the language of TG § 13-606 and the exposition of that language in *Frey* require that abatement of interest be based on 'reasonable cause' supported by 'affirmative evidence.'" The Comptroller argues that Brands failed to produce any affirmative evidence of reasonable cause, and that the Tax Court did not make any factual findings based on such evidence. The Comptroller further characterizes the Tax Court's standard for "reasonable cause" as "an absence of bad faith in filing the petition of appeal." According to the Comptroller, if abatement of interest can be satisfied by merely demonstrating good faith in the pursuit of litigation, then the "survival of statutory interest assessments will become the exception rather than the rule." We disagree with the Comptroller.

In its opinion, the Tax Court expressly found that Brands had "a reasonable basis for challenging the law and acted in good faith." Such finding clearly came from the extensive evidence adduced by Brands during the two-day trial before the Tax Court, coupled with the court's accurate description of the state of the case law as an evolution "though various court decisions" over the period of 2003 to 2014. We disagree with the Comptroller's characterization of the Tax Court's "reasonable cause" standard as merely the absence of bad faith in pursuing the appeal to the Tax Court. Given that the legality of the tax assessments at issue turned on the application of case law, the Tax Court properly focused its "reasonable cause" analysis on the state of that case law and its applicability to Brands.

The Tax General Article does not define reasonable cause, and as explained *supra*, we give "great weight" to "[t]he legal conclusions of an administrative agency that are premised upon an interpretation of the statutes that the agency administers." *Gore*, 437 Md. at 505 (internal quotation marks omitted). In our view, there is nothing in the statute or case law that precludes the Tax Court from finding reasonable cause for abatement of interest from the uncertainty in the state of the case law when applied to the circumstances of a particular taxpayer. Accordingly, we shall uphold the Tax Court's ruling to abate the interest accrued from the date of the filing of the appeal to the Tax Court, February 23, 2009, to the date of the court's Memorandum of Grounds for Decision, February 24, 2015.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT FOR ENTRY OF A JUDGMENT AFFIRMING THE TAX COURT; APPELLANT TO PAY THREE-FOURTHS OF COSTS AND APPELLEE TO PAY ONE-FOURTH OF COSTS.**