*Comptroller of Maryland v. Broadway Services, Inc.*, No. 2807, September Term, 2018, Argued: May 11, 2020

**PRINCIPAL-AGENT RELATIONSHIP – ANALYSIS OF THE RELATIONSHIP**

When analyzing whether an agency relationship exists between parties to a contract, the contract is the starting point for analyzing the nature of the parties' relationship, particularly whether a fiduciary relationship has been established or is precluded by the terms of the contract.

**PRINCIPAL-AGENT RELATIONSHIP – ANALYSIS OF THE RELATIONSHIP**

When analyzing whether an agency exists between affiliated business entities, the distinct nature of the entities should be respected unless a cognizable reason for disregarding the separateness of the entities has been established.

**PRINCIPAL-AGENT RELATIONSHIP-POWER TO ALTER LEGAL RELATIONSHIPS**

When analyzing whether an agency relationship exists, courts should consider whether the agent had the power to alter the principal's legal relations with third parties or even with the agent.

**PRINCIPAL-AGENT RELATIONSHIP - DUTY TO ACT FOR BENEFIT OF THE PRINCIPAL**

When analyzing whether an agency relationship exists, in determining whether a party has a duty to act for the benefit of another, courts should consider whether, in providing the service, the provider had a duty to place the interests of its client above its own interests.

**PRINCIPAL-AGENT RELATIONSHIP - THE PRINCIPAL'S RIGHT TO CONTROL THE AGENT**

A contractual requirement for a party to comply with company policies or legal obligations does not provide the control indicative of an agency relationship.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2807

September Term, 2018

_____

COMPTROLLER OF MARYLAND

v.

BROADWAY SERVICES, INC.

_____

Leahy,
Gould,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Gould, J.

_____

Filed: March 31, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

* Fader, C.J., and Nazarian, J., did not participate in the Court's decision to report this opinion pursuant to Maryland Rule 8-605.1.

This appeal requires us to review the Maryland Tax Court's determination that appellee Broadway Services, Inc. ("Broadway") was entitled to a refund for sales taxes it paid when, as part of the housekeeping supervisory services it provided to three non-profit hospital clients, it purchased the cleaning supplies used at each of the hospitals. Broadway's refund request was based on its contention that because it resold the supplies to the hospitals, its purchases fell outside the statutory definition of "retail sales" and thus were not subject to sales taxes. The request made its way to the Tax Court, which rejected Broadway's "reseller" theory. The Tax Court nevertheless granted the refund on the basis that Broadway purchased the supplies as an agent for the hospitals which, as tax exempt non-profits, were not subject to sales and use taxes.

The Comptroller petitioned the circuit court for judicial review, which affirmed the Tax Court's decision. The Comptroller timely appealed the circuit court's judgment and presents the following question:

> Did the Maryland Tax Court err when it determined that Broadway was the Hospitals' agent when no evidence showed a manifestation of an intent for Broadway to be the hospitals' agent, and Broadway failed to introduce evidence proving 1) that it had a fiduciary obligation to act for the Hospitals' benefit, 2) that it could alter the Hospitals' legal relationships, or 3) that it acted subject to the Hospitals' control?

We conclude that the answer to this question is yes and reverse.

### FACTS AND PROCEDURAL BACKGROUND

Broadway is in the business of providing security, parking, housekeeping, transportation, and facilities and property management services to its clients. Broadway is a for-profit company that provides services to clients both inside and outside of The Johns

Hopkins Health System ("JHHS"). Broadway is a subsidiary of the DOME Corporation ("DOME"), which in turn is owned in equal shares by The Johns Hopkins University (the "University") and JHHS.

In addition to its partial and indirect ownership in Broadway, JHHS owns multiple academic and community hospitals, some of which are non-profit corporations.[1] Certain types of non-profit organizations are exempt from sales and use taxes pursuant to Section 11-204 of the Tax-General Article ("TG") of the Maryland Annotated Code (1988, 2016 Repl. Vol.).

This case involves the services that Broadway provided between 2007 and 2011 to three non-profit hospitals within the JHHS system: Johns Hopkins Hospital ("Hopkins Hospital"), Johns Hopkins Bayview Medical Center ("Bayview"), and Howard County General Hospital ("Howard").[2]

The Comptroller of Maryland (the "Comptroller") conducted a sales tax audit of Broadway for the time-period of December 1, 2007 through November 30, 2011. Broadway responded to the audit with an application for an offset credit and refund in the amount of $76,161.96 for the sales tax it had paid to its vendors for cleaning supplies used at the three non-profit hospitals. Broadway stated on its application that the taxes were "improperly paid on services and products purchased for resale." Broadway's legal theory

---

[1] The word "own" in this context is used loosely, because, as discussed below, non-profit entities are technically not "owned" by anyone.

[2] These three hospitals are collectively referred to as the "hospitals."

2

was that although a sales and use tax is imposed on retail sales pursuant to TG § 11-102,[3] its purchases of supplies were governed by TG § 11-101(h)(3)(ii)(1), which excludes from the definition of a retail sale "a sale of tangible personal property if the buyer intends to . . . resell the tangible personal property in the form that the buyer receives or is to receive the property[.]"  Broadway contended that this provision applied to it because it purchased the supplies and resold them to the hospitals.

The Comptroller rejected Broadway's reseller theory, denied its refund request, and assessed Broadway $9,073.93 in unpaid sales and use taxes.

Broadway appealed to the Tax Court.  In its petition, Broadway asserted, under the penalty of perjury, that the supplies were purchased "for resale to three tax-exempt hospitals" and that "[a]ll of the cleaning supplies were used by employees of the three exempt hospitals."

The Comptroller moved for summary judgment in the Tax Court proceeding.  The Comptroller argued that Broadway did not qualify as a reseller because it did not sell the supplies to the hospitals.  In addition, based on deposition testimony of Broadway's President and CEO, Peter Seidl, the Comptroller was anticipating that Broadway would advance the alternative theory that it purchased the cleaning supplies as a purchasing

---

[3] TG § 11-102(a) provides that: "Except as otherwise provided in this title, a tax is imposed on (1) a retail sale in the State; and (2) a use, in the State, of tangible personal property or a taxable service."

agent.[4] Thus, in a preemptive attack on an agency theory that Broadway had not yet made, the Comptroller argued in its motion for summary judgment that Broadway was not acting as an agent for the hospitals when it purchased the cleaning supplies.

In response, Broadway rebuked the Comptroller for even raising the principal-agent issue, stating that the Comptroller "provides absolutely no background or authority to explain how this is even relevant to the matter before the Court."

Finding that material facts were disputed, the Tax Court denied the Comptroller's motion and held a one-day evidentiary hearing on Broadway's appeal. Broadway presented testimony from five individuals: (1) Mr. Seidl; (2) Linda Bushell-English, finance administrator of JHHS; (3) Patrick Michael Kastendike, Broadway's CFO; (4) Ken Dickard, Broadway's retained independent auditor; and (5) Andrew J. Maschas, an attorney in the Comptroller's office.

From the testimony of these witnesses, the following picture emerged regarding Broadway's business relationship with the hospitals. The housekeeping functions at the hospitals were performed by the hospitals' employees. The hospitals contracted with Broadway to supervise, evaluate, and train their janitorial staff. Broadway had separate written contracts with each hospital for the provision of these services.

The contracts also required Broadway to provide the cleaning supplies, which Broadway purchased from its vendors. The hospitals had to approve the supplies chosen

---

[4] Mr. Seidl testified in his deposition that there was a written agency agreement which apparently appointed Broadway as a purchasing agent under certain circumstances. However, the agreement did not, according to Mr. Seidl, authorize Broadway to act as an agent to purchase the cleaning supplies at issue in this case.

4

by Broadway to ensure compliance with their infectious disease protocols. The vendors shipped the supplies directly to the hospitals. The vendors' invoices were issued to and paid by Broadway.

From time to time, although not frequently, the hospitals purchased office supplies directly from a vendor and asked Broadway to pay for the items on their behalf. Broadway tracked those payments separately from the costs incurred in providing services and supplies to the hospitals.[5]

The contracts required the hospitals to pay Broadway a fixed annual fee for its services. This fee covered Broadway's labor and other costs, including cleaning supplies, plus an additional fifteen percent to cover Broadway's overhead. The fixed fee was based on Broadway's annual budget for such costs. Broadway invoiced the hospitals on a monthly basis for one-twelfth of the annual fixed fee. The hospitals did not see Broadway's detailed budgets or a breakdown of the expenses. The monthly invoices did not contain itemized charges for the cleaning supplies. The invoices would "just say housekeeping monthly fee." The hospitals therefore did not know how much Broadway spent on cleaning supplies.

Only in rare circumstances, such as when the parties agreed to increase the scope of the services, did the parties adjust the fixed fees mid-stream, and such changes were memorialized in a contract amendment. Otherwise, the fixed fee remained the same even

---

[5] Mr. Seidl testified that Broadway provided this service pursuant to a contract, which he called a "security contract," which was separate and distinct from the contracts at issue here. Thus, such purchases are not relevant to the purchases made pursuant to the three contracts at issue here.

if the prices of cleaning supplies fluctuated during the contract year. If Broadway's expenses increased, the parties would adjust the fee in the contract for the next year. Broadway was in a "tight margin" business and expected to make a nominal profit on its contracts with the hospitals. Mr. Seidl's testimony underscored the risk Broadway assumed under this arrangement, explaining that when predicting the expenses for the upcoming year, "[y]ou can't afford to be wrong."

At the conclusion of the evidence and the parties' closing arguments, the Tax Court ruled, without any explanation, that Broadway's purchases on the supplies did not qualify for the reseller exemption under TG § 11-101(h)(3)(ii)(1). The Tax Court found, however, that Broadway purchased the supplies as an agent of the hospitals, and on that basis concluded that Broadway "should not have been charged [a] sales tax." Thus, the Tax Court concluded that Broadway was entitled to a refund from the State in the amount of $76,161.96, plus interest.[6]

The Comptroller filed a petition seeking judicial review of the Tax Court's decision in the circuit court.[7] The circuit court denied the Comptroller's petition and affirmed the decision of the Tax Court. This timely appeal followed.

---

[6] The court's ruling did not require Broadway to remit the refund to the hospitals.

[7] The Comptroller filed its petition with the Circuit Court for Baltimore County, which transferred the matter to the Circuit Court for Anne Arundel County.

## DISCUSSION

The focus of our review is the decision of the Tax Court, not the decision of the circuit court. *Supervisor of Assessments v. Stellar GT*, 406 Md. 658, 669 (2008). We do not disturb factual findings and conclusions that are supported by substantial evidence in the record. *Frey v. Comptroller of the Treasury*, 422 Md. 111, 137 (2011). Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Id*. (cleaned up).

The Tax Court's legal conclusions are another matter. We accord "great weight to the agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose[,]" but if the decision is based on "the application and analysis of caselaw, that decision rests upon a purely legal issue uniquely within the ken of a reviewing court[,]" and in such cases, "we evaluate an agency's legal conclusions to determine whether they are based upon an error of law" without deference. *Id*. at 138 (cleaned up).

Here, the Tax Court's agency finding was not based on an analysis of statutes or regulations within the ambit of the Tax Court's expertise, but instead rested on widely applicable agency principles. Thus, we shall not accord any deference to the Tax Court's legal analysis of the underlying agency principles.

7

# I.

## AGENCY ANALYSIS

### A.

#### GENERAL PRINCIPLES

Writing for the Court of Appeals, Judge Chasanow described the essence of the principal-agent relationship as follows:

> According to the RESTATEMENT (SECOND) OF AGENCY, "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1 (1958). The creation of an agency relationship ultimately turns on the parties' intentions as manifested by their agreements or actions.

*Green v. H&R Block, Inc.,* 355 Md. 488, 503 (1999).

The agency relationship can arise from an express agreement or by inferences drawn from the parties' words and conduct. *Id.* Ascertaining the parties' intent is the central focus of a court's analysis. *Id.* at 505. The inquiry has been framed as follows:

> There are two fundamental elements for the creation of the agency relationship: (1) some manifestation or indication by the principal to the agent that he consents to the agent's acting for his benefit; and (2) consent by the agent to act for the principal. In sum, the agency relationship can arise only when there is mutual consent between the two parties that it should arise. However, consent may be inferred from words or conduct, including acquiescence. Whereas, however, some manifestation of the principal's consent must actually come to the attention of the agent, the agent need not necessarily communicate his consent to the principal if, under the circumstances, embarking on the purpose of the agency is, itself, a sufficient indication of consent.

*Id.* at 505-06 (quoting W. Edward Sell, Sell On Agency § 7, at 7-8 (1975)).

To guide its analysis of the relationship between the putative principal and agent, a court may look at the following three factors: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Id*. at 503. These factors are not "essential elements" of a principal-agent relationship, but instead are non-exclusive "considerations" to be "viewed within the context of the entire circumstances of the transaction or relations." *Id*. at 506. The party asserting a principal-agent relationship by inference has the burden of proving the existence of the relationship, "including its nature and its extent." *Id*. at 504 (citations omitted). If that party produces "legally sufficient evidence . . . of an agency relationship," whether an agency relationship exists becomes an issue of fact. *Id*.

## B.

### ANALYSIS OF THE RELATIONSHIPS

### 1.

### Distinguishing the Entities

As discussed above, Broadway and the hospitals are part of a larger corporate structure consisting of entities affiliated with JHHS. Here, the Tax Court treated "Johns Hopkins" and the hospitals as one and the same. The Tax Court started with the observation that the "basic facts of what was going on aren't in dispute." The Tax Court then used "Hopkins" as shorthand for the hospitals, stating "[i]t was an arrangement by, for lack of a burden, I'll call it Hopkins and Broadway; that Hopkins on an annual basis entered into an agreement to pay a fixed amount of money to Broadway to supervise some of the Hopkins'

9

employees[.]"  The Tax Court also stated that "Hopkins paid attention . . . on an annual basis [to] how much they were being charged" but "it was not as detailed as it would have been if they hadn't owned Broadway."  But, the Tax Court concluded, "it didn't matter what they paid Broadway because if they paid too much, they would get it back at the end as profits."

The Tax Court's conflation of "Hopkins" and the three hospitals permeated its description of how the supplies were chosen.  For example, the Tax Court stated that "[t]he supplies were specified by Hopkins," and then later, referring to the hospitals, stated that "[t]hey told [Broadway] what to buy, and those were the items that were purchased."  In addition, the Tax Court noted that the "supplies certainly were [for] the benefit of the hospital" and later stated that the supplies "were purchased as agents for Hopkins for the benefit of Hopkins so that they should not have been charged sales tax."

Tax Court's conflation of the entities was factually incorrect and legally improper, but to understand why this is so requires at least a rudimentary understanding of some of the attributes of non-profit organizations.  Generally, a non-profit entity "is an organization in which no part of the income is distributable to its members, directors, or officers."  MARILYN E. PHELAN, NONPROFIT ORGANIZATIONS: LAW AND TAXATION, 2D § 1.1 (vol. 1, Nov. 2017 ed.).  Although Maryland recognizes and allows for the formation of various forms of entities, including corporations, limited liability companies, and partnerships, "Maryland does not have a separate corporation code for nonprofit corporations." *Id.* at § 1:33.  Instead, in Maryland, non-profits usually take the form of a special corporation known as a non-stock corporation.  *Id.*  Non-stock corporations do not have owners as they

10

are not permitted to issue capital stock; instead, they have "members" and "directors." Md. Code Ann. (1975, 2014 Repl. Vol) Corporations and Associations Article ("C&A") § 5-202.[8]

In Maryland, certain "nonprofit organizations" may qualify for a sales tax exemption under TG § 11-204(a)(3). One of the requirements for this exemption is that the entity must be determined by the Comptroller to be a "charitable, educational, or religious organization." TG § 11-204(a)(3)(ii), (c), and (d). The Court of Appeals has stated that "a determination of whether an institution is charitable must include a careful examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations." *Comptroller of the Treasury v. Maryland State Bar Ass'n, Inc.*, 314 Md. 655, 669 (1989) (quotation omitted).

Thus, if an entity receives an exemption certificate from the Comptroller, it can reasonably be inferred that the Comptroller carefully examined the stated purposes and actual work performed by the entity. That's the case here with respect to the three hospitals and JHHS, because the testimony and exhibits established that each qualified for the sales tax exemption under TG § 11-204(a)(3). And although the record does not indicate which of the categories—charitable, educational, or religious—applied, for present purposes, it

---

[8] The record does not indicate whether these entities are non-stock corporations under Maryland law, and if so, how their internal affairs are governed. We can, however, take judicial notice from information available on the website of the Maryland State Department of Assessments and Taxation that the three hospitals and JHHS are, in fact, Maryland non-stock corporations.

suffices to note that the following three points are established inferentially by the evidence in the record. *One*, the three hospitals and JHHS each established their own stated charitable, educational, or religious purpose. *Two*, each proved to the satisfaction of the Comptroller that the actual work they performed was in furtherance of their stated purpose. And *three*, each has its own board of directors and is separately managed and operated in accordance with their respective stated purposes. In other words, each of these entities is distinct from one another, both legally and in practice.

Under Maryland law, corporations are deemed separate and distinct from their stockholders. *See Gosain v. Cnty. Council of Prince George's Cnty.*, 420 Md. 197, 210 (2011). That's generally true of subsidiaries and their parent companies. *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 529 (1964). For income tax purposes, Maryland courts have considered whether a subsidiary corporation is a separate business entity apart from its parent corporation by assessing the following factors: 1) how dependent a subsidiary is on its parent company for income; 2) whether there is a circular flow of money from the parent company to the subsidiary and then back to the parent; 3) how much the subsidiary relies on the parent for its core functions and services; and 4) whether the subsidiary has substantive activity that is "in any meaningful way separate from" its parent. *ConAgra Foods RDM, Inc. v. Comptroller of the Treasury*, 241 Md. App. 547, 575 (2019); *see also Gore Enter. Holdings, Inc. v. Comptroller of the Treasury*, 437 Md. 492, 516-17 (2014); *Comptroller of the Treasury v. Syl, Inc.*, 375 Md. 78, 106 (2003). Here, the Tax Court blurred the distinction between Broadway, the hospitals, and JHHS without assessing any of these factors and without sufficient evidence in the record to do so.

12

Hospitals and universities are sophisticated entities doing business in complex and highly regulated industries. Indeed, the relationships between non-profit hospitals and affiliated for-profit entities raise complicated federal tax and other corporate issues. *See, e.g.*, Andrea I. Castro, Comment, *Overview of the Tax Treatment of Nonprofit Hospitals and their For-Profit Subsidiaries: A Short-Sighted View Could be Very Bad Medicine*, 15 Pace L. Rev. 501 (1995); Melvin Horowitz, *Corporate Reorganization: The Last Gasp or Last Clear Chance for The Tax-Exempt, Nonprofit Hospital?*, 13 Am. J.L. & Med. 527 (1988). Presumably the corporate structure and relationships among the various entities were established in furtherance of a carefully thought-out plan that took into consideration the relevant tax and corporate issues. And presumably the architects of this plan intended that this structure be maintained and honored, even when inconvenient or more costly to do so. The proceedings in the Tax Court—in which the only party involved in the litigation was at the lowest rung of the corporate ladder—yielded no evidence on which the Tax Court could properly treat the hospitals, JHHS, and Broadway as one and the same.

## 2.

### The Contracts

Returning to the agency analysis that lies at the heart of this matter, as noted above, the central inquiry is whether each hospital and Broadway mutually intended to establish a fiduciary relationship. The record is limited as to the hospitals' intentions because none of the employees, officers, or directors from the hospitals testified at the Tax Court hearing. And, none of the witnesses called by Broadway purported to have such knowledge.

13

The hospitals did, however, express their intent through their execution of the contracts. *See Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393-94 (2019) (the intent of parties to a contract is discerned from the words of the contract); *Adloo v. H.T. Brown Real Est., Inc.*, 344 Md. 254, 261 (1996) ("determining the intention of the parties to a contract involves construing the language of the contract, more particularly, the words of the subject clause").  As acknowledged by Broadway in its brief and before the Tax Court, though it *is* true that the hospitals required cleaning services, it is *not* true that Broadway was the only company capable of providing such services. On this record, therefore, the relationships between Broadway and the three hospitals were voluntary and contractual.[9]

Thus, if one wanted to ascertain the intentions of the hospitals and Broadway with respect to the purchase of cleaning supplies, the contracts would be the first place to look. The Tax Court did this to a limited degree when it summarily ruled out an agency by express agreement.  This was a start, but instead of jumping straight to the three factors discussed above, the Tax Court should have examined the contracts to determine the nature of the relationship they established.

Our own examination leads us to the conclusion that the contracts established arms-length relationships between Broadway and the hospitals.  Mr. Seidl testified that Broadway "mimicked" the contracts used by Broadway's more well-known national

---

[9] This conclusion is one of the consequences of honoring the overall corporate plan in which Broadway and the hospitals were purposefully separated as distinct entities.

14

competitors, Sodexo, Crothall, and Aramark.  Thus, the parties' choice of contract template indicates a purposeful effort to create an arms-length relationship, notwithstanding their shared connection to JHHS.

Moreover, under the plain language of each contract, and with slight variations in the specific wording of the contracts, Broadway was required to "provide" the cleaning supplies "to" the hospitals' housekeeping employees.[10]  The word "provide" in this context is synonymous with words such as "bring," "make available," or "furnish,"  none of which connote or confer the status of a purchasing agent of cleaning supplies.  So long as the supplies were permitted under the hospitals' infectious control standards, Broadway was left to its own devices in choosing what, how much, and when.  Broadway alone was

---

[10] Section IX of the Howard contract provided:

[Broadway] shall provide[] cleaning supplies and minor cleaning equipment to [Broadway] personnel performing housekeeping duties in and about the facility.  It is understood that all paper and plastic supplies will be provided by the [C]lient.  Major equipment such as buffing machines, floor scrubbers, vacuums, etc. are to be provided by the Client.

Section VIII of the Hopkins Hospital contract provided:

[Broadway] shall provide cleaning supplies and equipment to Client personnel performing housekeeping duties in and about the facility.  The provision of plastic trash can liners, paper restroom supplies and hand soap is the responsibility of the Client.

Section VIII of the Bayview contract provided:

[Broadway] shall provide cleaning supplies, minor and major cleaning equipment to [Broadway] and the Client personnel performing services in and about the facility.  The [C]lient shall supply plastic trash can liners, paper restroom supplies, and hand soap.

15

responsible for payment for the products and coordinating the orders. Broadway had no duty to disclose pricing data to the hospitals. If the prices of the supplies went down during the contract term, Broadway suffered the loss; if the prices went up, Broadway enjoyed the gain.[11]

Moreover, the contracts each contain an integration clause and a "no oral modifications" clause that preclude the assumption of any duties not expressed in the contracts. Each contract states:

> This agreement represents the entire Agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral. . . . No amendment of this Agreement shall be valid and effective unless in writing and signed by the parties hereto. . . .

In the absence of fraud, which is not alleged here, integration clauses in contracts are generally enforceable. *See Hovnanian Land Inv. Group, LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 126 (2011) ("Maryland law generally recognizes the validity and effect of integration clauses."). This is especially so where, as here, the contracting parties are sophisticated entities. *See Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.,* 194 Md. App. 375, 391–92 (2010). Thus, the parties mutually agreed to cabin the terms of their business relationship to the four corners of the contracts and preclude any unwritten modifications.[12]

---

[11] As explained below, the parties' practice of adjusting prices in each subsequent contract term does not negate the contracts' allocation of risks and benefits during the contract term.

[12] To be sure, parties can waive integration and no oral modification clauses orally or through their conduct. *Hovnanian*, 421 Md. at 125-26. Here, however, Broadway never

16

Our conclusion about the arms-length nature of the relationships between Broadway and the hospitals is supported by Maryland caselaw that has addressed this issue in other business contexts. For example, in *Brass Metals Prods., Inc. v. E-J Enters., Inc.,* 189 Md. App. 310, 357 (2009), we had to decide whether the business relationship between a purchaser and supplier qualified as a confidential relationship.[13] The dispute involved multiple plaintiffs, multiple defendants, and multiple claims. In the claim relevant here, the purchaser of aluminum railings sued its exclusive supplier for, among other things, non-disclosure and concealment. *Id.* at 354. The supplier understood that the purchaser had designed the railings and claimed exclusive rights in their designs. *Id.* at 318. Yet unbeknownst to the purchaser, the supplier sold the same products to the purchaser's competitor. *Id.* at 323. The purchaser alleged that the supplier's failure to disclose this information amounted to fraudulent concealment/non-disclosure. *Id.* at 325-26. But to sustain this cause of action, the purchaser had to prove that the parties had a confidential relationship that imposed a duty of disclosure on the supplier. *Id.* at 354.

---

contended the parties modified or waived any of the contractual clauses relevant to whether Broadway served as fiduciary in purchasing the supplies at issue here. Nor does the record reflect any modifications to such clauses through the parties' course of dealing.

[13] As the Court of Appeals stated in *Thompson v. UBS Financial Services, Inc.*, 443 Md. 47, 70 (2015), "a Plaintiff and Defendant are in a confidential relationship where the Defendant has gained the Plaintiff's confidence and purports to act or advise with the Plaintiff's interests in mind," and "all fiduciary relationships are confidential relationships." A relationship can be considered confidential, however, even if it's not a fiduciary relationship. *Buxton v. Buxton*, 363 Md. 634, 654 (2001). Thus, a finding that a relationship is not confidential means it's not a fiduciary relationship either.

In affirming the trial court's grant of the supplier's motion for judgment, we rejected the purchaser's contention that it had a confidential relationship with its supplier, and held that their relationship was "a typical 'arms-length' transaction between two businesses to 'further their own separate business objectives, rather than joined together to achieve a common business objective.'" *Id*. at 358 (quotation omitted). We did not rule out the possibility that a business relationship could also be a confidential relationship, but we noted that "[c]ertain factors above and beyond a typical business relationship must exist[.]" *Id*. at 357. We held that trusting and relying on the other party to perform its side of the transaction is not enough; rather, something "apart" from the transaction itself is required to create a confidential relationship. *Id*. at 359. As an example, we took note of authority supporting the proposition that a confidential relationship could be found where the parties had a close personal relationship before becoming business associates. *Id*. at 357.

Likewise, notwithstanding the imbalance of bargaining power that often attends the landlord-tenant relationship, such relationships are generally considered to be contractual, but not confidential. *See Rhaney v. Univ. of Md. E. Shore*, 388 Md. 585, 603 (2005); *P.V. Props., Inc. v. Rock Creek Vill. Assoc. Ltd. P'ship*, 77 Md. App. 77, 91-92 (1988).[14]

---

[14] In *PV Properties*, we stated that if the tenant was completely dependent on the landlord for information about the common area maintenance charges that the tenant was required to pay, the landlord had a limited fiduciary duty to provide the tenant with an accounting of such expenses. 77 Md. App. at 91-92. No such dependence has been shown here. To the contrary, the hospitals had the same access to the vendors of cleaning supplies as Broadway. Indeed, Mr. Seidl testified that the hospitals did not have to rely on Broadway to buy and provide the supplies, and that Broadway could have simply agreed to provide the supervisory and managerial services.

18

Similarly, the relationship between a bank and its borrower/customer is also considered contractual and not confidential. *See Parker v. Columbia Bank*, 91 Md. App. 346, 368–71 (1992).

Although we do not rule out the possibility that entities with common ownership could, depending on the specific facts and circumstances, have a confidential relationship, the evidence in this record supports no such conclusion. *First*, the hospitals and Broadway chose to document their relationships with contracts that appear in all respects to create arms-length relationships. *Second*, the record discloses nothing about the internal governance structures of the hospitals and Broadway from which such a relationship could be inferred, such as, for example, the composition, roles, and responsibilities of members of their respective board of directors.[15] On this record, therefore, we discern no basis to put Broadway's contractual relationships with the hospitals on a different footing than the arms-length nature of the relationships between a purchaser-supplier, landlord-tenant, or creditor-borrower. Thus, we hold that the contracts between Broadway and the hospitals established a contractual relationship devoid of any fiduciary obligations, thereby precluding an agency finding as a matter of law.

---

[15] Because of the duties imposed on directors under C&A § 2-405.1, we do not rule out the possibility that if the parties had a sufficient number of overlapping directors, there could conceivably be a basis to infer the existence of a confidential relationship.

C.

THE TAX COURT'S ANALYSIS OF THE THREE FACTORS

After correctly noting that an agency relationship was not established by an express agreement, the Tax Court proceeded to apply the three factors discussed above. In doing so, however, the Tax Court misapprehended the relevant legal principles and made at least one factual finding critical to its analysis that lacked evidentiary support. We address each factor in turn.

1.

Power to Alter Legal Relationships

The Tax Court's analysis of this factor centered on (1) whether Broadway had the power to change the supplies it used; and (2) whether the parties altered the terms of their contracts. The Tax Court stated:

> First is power to alter. I don't see that there were any alterations in terms of the chemicals in any given year. Hopkins told them what to buy, and those are the ones that they purchased. There was some testimony that mid-year, at least once, the contract was re-negotiated because the contract amount wasn't enough. Hopkins added a building or two, and the contract -- they were running out of money. They didn't have enough money to cover it, so Hopkins made an amendment to the contract; that if they had too much money, which didn't seem to happen, there was sort of an agreement that the next year they would make it up by charging less. But I didn't hear any testimony that ever happened.

The Tax Court's focus on whether there was a change in the chemicals used or whether the parties amended or renegotiated their contracts misstated the issue and was legally incorrect. The issue was whether Broadway had the power to alter the hospitals'

20

legal relations with third parties or even with Broadway.  As explained by the Restatement

(Second) of Agency:

> The phrase "power of an agent" denotes the ability of an agent or apparent
> agent to affect the legal relations of the principal in matters connected with
> the agency or apparent agency.  The exercise of this power may result in
> binding the principal to a third person in contract; in divesting the principal
> of his interests in a thing, as where the agent sells the principal's goods; in
> the acquisition of new interests for the principal, as where the agent buys
> goods for the principal; or in subjecting the principal to a tort liability, as
> where a servant, while acting within the scope of his employment, injures a
> third person.  The agent also has power to alter the legal relations between
> himself and the principal, creating rights and liabilities inter se by his proper
> or improper exercise of authority.

RESTATEMENT (SECOND) OF AGENCY § 12 cmt. a (Am. Law Inst. 1958); *see also Schear*

*v. Motel Mgmt. Corp. of Am.*, 61 Md. App. 670, 687 (1985) (citing RESTATEMENT

(SECOND) OF AGENCY §§ 12-14 (1958)).

There is no evidence in the record that Broadway had the right to change the

hospitals' legal relationships with third parties, particularly with respect to the purchase of

cleaning supplies.  Certainly, the contracts gave Broadway no such right.  Broadway

purchased the supplies from its vendors, with which Broadway had its own contractual

relationships.  Thus, any changes in the terms of the contracts with the vendors altered only

Broadway's legal relationships, not those of the hospitals.[16]

One of the hallmarks of a principal-agent relationship is that the principal is liable

for the contractual debts incurred by the agent acting within the scope of the agency.

---

[16] Broadway seems to concede that this factor does not support the Tax Court's
finding, stating "[w]hether Broadway was able to legally bind the Hospitals to third-parties
is not an issue in this matter."

21

*Grinder v. Bryans Rd. Bldg. & Supply Co.,* 290 Md. 687, 707-08 (1981). Yet, based on the evidence before the Tax Court, the only possible conclusion was that Broadway, and Broadway alone, incurred liability for the purchase of the cleaning supplies. Based on the facts in this record, it made no difference if Broadway purchased too many or too few supplies or if it did or did not have sufficient funds to pay for the supplies. Either way, Broadway's actions altered only its legal relationships with the vendors; the vendors had no recourse against the hospitals.[17]

The Tax Court's analysis of this factor also rested on a clearly erroneous factual finding that "Hopkins told [Broadway] what to buy." Neither the contracts nor the testimony supported this finding. The testimony established only that Broadway could not choose a product without getting approval from the hospitals' infectious control unit that the proposed product was "an acceptable product to be used in health care." In other words, the hospitals could veto a proposed cleaning product if it didn't comply with their infectious disease policies, but they could not require Broadway to use a particular product.

_____

[17] Nor was there any evidence that Broadway had the unilateral right to alter its contracts with the three hospitals. To the contrary, as explained above, the contracts expressly prohibited Broadway from unilaterally amending the contracts, and there is no evidence that, in practice, Broadway ever purported to unilaterally amend their contracts. Broadway would counter that because the parties' practice was to adjust the contract price when the contract is renewed at the end of the year to make up for any losses due to price changes, in effect Broadway had the ability to unilaterally alter its contracts with the hospitals. However, a consequence of holding the parties to the contractual nature of the relationship they chose to create is that Broadway could not have required the hospitals to retain its services in the subsequent contract year. Thus, although Broadway may have *expected* to renew the contracts and recoup any losses incurred during a given contract period, Broadway did not have the power to *require* the hospitals to do so, let alone dictate the terms of a renewed contract.

By resting its decision on an unsupported factual determination, the Tax Court committed reversible error. *See Domingues v. Johnson*, 323 Md. 486, 494 (1991).

## 2.

## Duty to Act for Benefit of the Principal

The agent's duty to act primarily for the principal's benefit arises from the fiduciary nature of their relationship. RESTATEMENT (SECOND) OF AGENCY, § 13 cmt. a. In *Green*, the Court of Appeals reiterated the

> universal principle in the law of agency, that the powers of the agent are to be exercised for the benefit of the principal *only, and not of the agent or of third parties.* A power to do all acts that the principal could do, or all acts of a certain description, for and in the name of the principal, is limited to the doing of them for the use and benefit of the principal only, *as much as if it were so expressed.*

355 Md. at 517 (cleaned up). The Court further explained that

> an agent is under a strict duty to avoid any conflict between his or her self-interest and that of the principal: It is an elementary principle that the fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest.

*Id*. at 517-18 (cleaned up). In addition, the agent must disclose to the principal any information that is "significant and material to the affairs of the fiduciary relationship." *Id*. at 518 (cleaned up). And, the agent has a duty to account to its principal for any profits made on the transaction. *Id.* at 518-19.

In discussing this factor, the Tax Court noted that the supplies were used for the benefit of the hospitals, that the hospitals told Broadway what to purchase, and that having Broadway order the supplies was "again to the benefit of the hospital" because Broadway had the personnel qualified to make such determinations. As noted above, the Tax Court

also stated that to "some extent, it didn't matter what they paid to Broadway because if they paid too much, they would get it back at the end as profits."

Again, the Tax Court misunderstood the issue. The issue was not whether the cleaning supplies were used for the benefit of the hospitals or who benefited from the fact that Broadway was the party responsible for ordering supplies. That's true of every service contract—the recipient of the service is supposed to benefit from the service. The Tax Court's misunderstanding of this factor was an error of law necessitating a reversal.

The central issue as to this factor was whether, in providing the service—here, the provision of cleaning supplies—the provider had a duty to place the interests of its client above its own interests. *Green*, 355 Md. at 518. On that issue, the Tax Court made no finding, and that Broadway had no such duty is highlighted by the implications behind the parties' agreements.

Suppose there are two brands of a cleaning product that perform the same function, both of which have been approved by the hospitals' infectious disease departments. Let's further suppose that one brand costs $10 per unit, the other brand costs $9 per unit, and although both brands would be appropriate and reasonable choices, the difference in the price is attributable to a difference in the quality of the product. Because the fee paid to Broadway is fixed, if both parties act in their own interests, the hospitals would presumably favor the more expensive but higher quality brand, and Broadway would logically prefer the less expensive albeit lower quality brand. But, if Broadway served in a fiduciary capacity, it would be required to subordinate its interests in profits to the hospitals' interest in quality. *See id.* at 518. Yet, there is not a single provision in the written contracts that

24

even hints at such a duty on Broadway's part; nor was there any evidence that Broadway accepted such a duty through the parties' course of performance.

Echoing the Tax Court's line of reasoning, Broadway argues that the hospitals' and Broadway's common ownership meant that their interests were aligned. Presumably, Broadway is suggesting that by acting in its own best interests, it necessarily meant that it was also acting in the best interests of the hospitals. Relatedly, Broadway argues that it didn't matter whether Broadway or the hospitals enjoyed the savings or bore the risk from price fluctuations because, due to their shared ownership, any profits were "returned to JHHS in any event." The evidence in the record, however, does not support Broadway's theory.

As stated above, one of the defining attributes of a non-profit organization is that it is not permitted to distribute profits to its members and directors. Thus, it matters greatly where, as between Broadway and the hospitals, the risks and benefits of a transaction are allocated. For example, suppose that due to a decrease in prices of the supplies, Broadway would save $10,000, $20,000, and $30,000 in its contracts with Bayview, Howard, and Hopkins Hospital, respectively. If those savings were allocated to the three hospitals in those amounts, as would be required if Broadway was the hospitals' agent, the increased "profits" would not filter up to JHHS because, as non-profit entities, no distributions are permitted. But if the benefits of those savings were allocated to Broadway, as would be

25

the case in an arms-length relationship, the $60,000 in savings would ultimately inure to the benefit of Broadway's parent entities. [18]

On the evidence contained in this record, therefore, we cannot accept Broadway's contentions that the interests of the entities are *necessarily* aligned, or that it makes no difference whether Broadway or the hospitals profit from their transactions, or that, as a result, Broadway had a duty to act for the benefit of the hospitals. Both the evidence and basic logic suggest otherwise.[19]

---

[18] From the evidence in the record, particularly the contracts, the only supportable inference is that the architects of the overall corporate structure intended that the profits would be earned by Broadway, not the hospitals. Moreover, from the testimony of JHHS's employee, Linda Bushell-English, one can reasonably infer that JHHS exists to provide support services to each of the non-profit hospitals under its umbrella. That being the case, it would make no sense to allocate the profits to the hospitals because they lack the flexibility to efficiently re-allocate the profits to ensure that the needs of all of the hospitals are met. In contrast, if the profits were allocated to Broadway, then JHHS would have the flexibility to deploy the additional resources in the most efficient manner to serve the needs of each hospital under its umbrella.

[19] Relatedly, Broadway contends that "Hopkins performed audits on Broadway to ensure the latter was keeping costs low" and therefore Broadway had a duty to act primarily for the hospitals' benefit. For that assertion, Broadway relies on this exchange between the Tax Court and Mr. Seidl:

> [THE COURT]: Does the hospital look over your -- the amount of money you spent in supplies annually?
>
> [THE WITNESS]: More they look at the budget, total budget. If it was out of line or we were asking for increase, yes, we would have to give backup supporting that.
>
> [THE COURT]: They don't -- they never look at invoices for --
>
> [THE WITNESS]: No.

## 3.

### The Principal's Right to Control the Agent

A principal's level of control necessary to support a finding of an agency relationship is not susceptible to a formulaic articulation, but "the principal must have ultimate responsibility to control the end result of his or her agent's actions; such control may be exercised by prescribing the agents' obligations or duties before or after the agent acts, or both." *Green*, 355 Md. at 510. For example, although a lawyer may negotiate a business transaction or a settlement agreement largely without supervision from a client, the client ultimately makes the final decision whether to move forward. *Id.* at 511.

Here, the Tax Court did not discuss the control factor expressly, other than stating that the hospitals "told [Broadway] what to buy." As noted above, this was factually incorrect; the hospitals merely had to approve the cleaning supplies used by Broadway for compliance with their infectious disease control guidelines and their obligations imposed by law. *See* COMAR 10.07.01.34.[20] Otherwise, the choice of supplies was left to

---

[THE COURT]: -- supplies to see how much you were spending?

[THE WITNESS]: No. Internal audit from Johns Hopkins comes and audit our contracts. They may look at it at that time. But no, we don't need to get approval for them to come look at something.

We fail to see how speculation that the hospitals "may look at" the spending for supplies supports Broadway's assertion that the hospitals were monitoring the costs of supplies to keep the costs to a minimum. There is no evidence in the record as to the nature, scope, or purpose of any such audits.

[20] COMAR 10.07.01.34.F.(b) states:

Broadway. A contractual requirement for a party to comply with company policies or legal obligations does not provide the control indicative of an agency relationship. *Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487, 509 (2003) (finding that an issuer's requirement that its brokers comply with its policies and securities laws did not provide the control necessary to create an agency relationship); *Schear*, 61 Md. App. at 686-88 (holding a franchisor's right to ensure franchisee's compliance with its policies does not establish a confidential relationship). Accordingly, although the extent of the hospitals' control over Broadway didn't much factor into the Tax Court's analysis, we conclude that it militates against a finding of an agency relationship.

## II.

## RESELLER

Citing the general principle of appellate law that "an appellate court may affirm a trial court's decision on any ground adequately shown by the record," *see Capron v. Mandel*, 250 Md. 255, 259 (1968), Broadway contends that the Tax Court's decision can be upheld based on the reseller theory that the Tax Court rejected. The Comptroller disagrees and relies on the general rule that "[a]n administrative agency may be affirmed

---

(b) Sanitation.
(i) The hospital shall maintain a sanitary environment to prevent the spread of communicable diseases and infections.
(ii) The hospital shall have systems to maintain the environment in a clean and sanitary condition.
(iii) Systems shall be provided to ensure that housekeeping, linen handling, waste disposal including medical waste, food handling, ventilation systems, water systems, and pest control meet acceptable federal and State standards and guidelines.

28

only on the basis of the grounds on which it decided the case." *Classics Chicago, Inc. v. Comptroller of the Treasury*, 189 Md. App. 695, 707 (2010). The Comptroller further notes that Broadway did not file a cross-petition for judicial review based on the Tax Court's denial of its reseller theory, thus implying that Broadway waived its right to obtain judicial review on that issue. To that, Broadway responds that it was not permitted to seek judicial review because it was not aggrieved by the final decision of the Tax Court.

As a general matter, the Comptroller is correct that we may affirm solely on the grounds and reasons as stated by the Tax Court, and we are not permitted to affirm the circuit court on other grounds adequately appearing in the record. For starters, the Tax Court expressly considered and rejected Broadway's reseller argument. It would therefore be inappropriate for us to affirm its decision on the grounds that the evidence *could have* supported a finding that the reseller exemption applied. Rather, to the extent judicial review is available on that issue, it would have to be conducted under the deferential "substantial evidence" standard for factual findings, and as to legal conclusions, we would have to "afford great weight" to the Tax Court's interpretation of the statutory reseller exemption. *Frey*, 422 Md. at 136-38.

Even if the Tax Court had not rejected Broadway's reseller theory, our hands would still be tied. As the Court of Appeals has explained:

> Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is

29

sustainable on the agency's findings and for the reasons stated by the agency.

*United Steelworkers of Am. AFL-CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679–80 (1984) (cleaned up); *see also Comptroller of the Treasury v. Taylor*, 465 Md. 76, 98–99 (2019). Thus, to the extent that Broadway urges us to affirm the Tax Court by searching the record for evidence that supports its reseller theory, we are constrained to decline.[21]

Whether Broadway had the right to obtain judicial review of the Tax Court's rejection of its reseller theory is another question. By statute, only "a party who is

---

[21] We note that the rationale behind this rule does not seem to apply in the context of this case. The Court of Appeals explained:

> Were we to search the subject record for evidence sufficient to support any one or more of the theories advanced by Steelworkers or by [the Commissioner of Labor and Industry occupational safety and health staff], and then to decide if that theory constitutes a violation of the general duty clause, we would be performing the administrative function that [the Maryland Occupational Safety and Health Act] commits to the Commissioner, and not our proper function of judicial review.

*United Steelworkers*, 298 Md. at 680. Here, there would be no danger of the judiciary usurping an administrative function because the Tax Court considered and rejected Broadway's reseller theory, leaving us with the sole task of reviewing that decision, not making it in the first instance. More recently, in *Comptroller of the Treasury v. Taylor*, the Court of Appeals articulated the same issue in terms of the preservation requirement, noting that an issue is not preserved if the Tax Court contemplated an issue but "did not base its final decision on the issue." 465 Md. at 98-99. Here, the Tax Court addressed the agency theory only after it rejected the reseller theory; thus, it could be plausibly argued that the issue was preserved because the Tax Court's final decision was based at least in part on its rejection of the reseller theory. That said, the Court of Appeals did not budge from the well-settled principle that "the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Id*. at 98. In our view, therefore, our hands remain tied.

30

aggrieved by the final decision" "is permitted to seek judicial review." Md. Ann. Code (2014) State Government ("SG") § 10-222(a).[22] The final decision of the Tax Court granted Broadway's request for a tax refund; in that sense, therefore, Broadway could not have claimed aggrieved party status. However, once the Comptroller filed its petition for judicial review, Broadway's status as a non-aggrieved party was put in jeopardy depending on the outcome of the judicial review process.

The question, therefore, becomes whether Broadway could have preserved the reseller issue by filing a conditional cross-petition for judicial review. Arguably, once the Comptroller filed its petition for review on the agency issue, Broadway could have filed a conditional cross-petition under Rule 7-203(b) to preserve for judicial review the reseller issue and thereby provide an alternative basis to reach the same result as the Tax Court.[23] Given the novelty of the issue and the absence of any briefing on this topic, under the circumstances, we conclude that Broadway should not be foreclosed of the right to seek judicial review of the Tax Court's rejection of its reseller theory. Accordingly, this case shall make its way back to the Tax Court with instructions to enter a new final decision denying Broadway's petition for a tax refund based on the Tax Court's prior rejection of Broadway's reseller theory.

---

[22] SG §§ 10-222 and 10-223 apply to judicial review from decisions from the Tax Court. *See* TG § 13-532(a).

[23] Rule 7-203(b) states "[i]f one party files a timely petition, any other person may file a petition within ten days after the date the agency mailed notice of the filing of the first petition, or within the period set forth in section(a), whichever is later."

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO CIRCUIT COURT WITH INSTRUCTIONS TO VACATE THE FINAL DECISION OF THE TAX COURT AND REMAND THE CASE TO THE TAX COURT WITH INSTRUCTIONS TO ENTER A NEW FINAL DECISION DENYING BROADWAY'S PETITION FOR A TAX REFUND. COSTS TO BE PAID BY APPELLEE.**